UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES DANIELS, KEITH TAYLOR,
ERROL TOULON, JR., HAKIM S. EL-QUHIR,
CLEMENT GLENN, individually and on behalf
of all others similarly situated,

       Plaintiffs,

   -against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTIONS, CYNTHIA
BRANN, Commissioner, JOSEPH PONTE, former
Commissioner, JEFF THAMKITTIKASEM, Chief
of Staff,  MARTIN MURPHY, former Chief of
Department, SHIRVAHNA GOBIN, Deputy
Commissioner, and HEIDI GROSSMAN, Deputy
Commissioner.

       Defendants.

**Case No.:**

**COMPLAINT WITH
JURY DEMAND**

Charles Daniels, Keith Taylor, and Errol Toulon, Jr., Hakim S. El-Quhir, Clement Glenn, (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, for their Complaint against Defendants the City of New York, New York City Department of Corrections, Cynthia Brann, Commissioner, Joseph Ponte, former Commissioner, Jeff Thamkittikasem, Chief of Staff, Martin Murphy, former Chief of Department, Shiruana Gobin, Deputy Commissioner, and Heidi Grossman, Deputy Commissioner (collectively "Defendants"), allege as follows:

## INTRODUCTION

1.  This action seeks to vindicate the rights of Plaintiffs, African-American employees of the New York City Department of Corrections (the "DOC"), who have been denied or delayed promotions, or were terminated or forced to resign, or were subject to adverse employment conditions based solely upon

1

their race and color. As set forth more fully below, the Plaintiffs allege in this action that Defendants the City of New York (the "City") and the individually named Defendants as current and/or former employees of the DOC, have engaged in a pattern or practice of racial discrimination and retaliation based upon, *inter alia*: 1) failure to promote African American supervisors within the DOC; 2) failure to provide African American supervisors with the appropriate equipment, fiscal, and personnel resources that were provided to similarly-situated, non-African American employees; 3) a practice of marginalizing African American supervisors; and 4) forcing several African American employees to resign or retire in lieu of threatened termination or demotion.

2.      For years, the Defendants have engaged in a pattern or practice of systemic, continuous, and intentional discrimination against African American administrative and management employees in job placement, advancement opportunities, and compensation decisions. Defendants have denied African Americans the same advancement opportunities as have been afforded to non-African Americans, resulting in a severe underrepresentation of African Americans at the supervisory levels of the agency. This broad pattern of racial discrimination has resulted in a far less percentage of African American supervisors at the DOC as compared to other government agencies in New York City.

3.      Despite repeated attempts by Plaintiffs and numerous similarly situated African American employees to curtail this severe and pervasive discrimination by, *inter alia*, reporting the repeated instances of discrimination to their supervisors, the Office of Equal Employment Opportunity, and the Executive Staff, Defendants utterly failed to take appropriate corrective actions and permitted the hostile work environment to persist unabated for years. The Plaintiffs all suffered a similar fate when they voiced their concerns to Defendants: Their complaints were wholly ignored, their authority and decision-making responsibilities were removed, their equipment, fiscal, and personnel resources were severely restricted, and/or their voices were completely stifled as they were forced to retire or resign.

4.      Plaintiffs bring this action on behalf of themselves and all other similarly situated employees. They claim that the DOC's racial discrimination violates Title VII, 42 U.S.C. § 2000e *et seq.,* 42 U.S.C. § 1983, Section 296 of the New York Executive Law, and Section 8-107 of the New York City Administrative Code.

## PARTIES

### *Named Plaintiffs*

5.      Plaintiff Charles Daniels served as Senior Deputy Commissioner of the DOC from January 2017 until his forced resignation in April 2017. He currently resides in Long Island City, New York.

6      Plaintiff Hakim S. El-Quhir is a twenty-eight (28) year veteran of the DOC. He retired in April 2017. He currently resides in Wyandanch, New York.

7.      Plaintiff Clement Glenn has been employed by the DOC in a supervisory capacity since June 2004. He currently serves as Warden of the Rikers Island West Facility. He resides in St. Albans, New York.

8.      Plaintiff Keith Taylor was employed by the DOC from February 2015 until his forced resignation on February 28, 2017. Prior to his resignation, he served as Assistant Commissioner. He currently resides in New York, New York.

9.      Plaintiff Errol Toulon, Jr. served as Deputy Commissioner of Operations of the DOC from July 2014 until his forced resignation in January 2017. He currently resides in Lake Grove, New York.

### *Defendants*

10.      The City of New York (the "City") is a municipal corporation existing by the virtue of the laws of the State of New York. The City, through the Department of Corrections ("DOC"), maintains a policy and practice of discrimination against African American employees. The City is liable for the discrimination suffered by Plaintiffs and similarly situated African American employees.

11.    Joseph Ponte is a white male and was the Commissioner of the DOC from April 2014 until May 2017.  As Commissioner, he was responsible for the development, implementation, and enforcement of all DOC practices and policies. He was likewise responsible for the training and supervision of DOC personnel and the overall administration of DOC facilities. Joseph Ponte retired in May 2017 amid an investigation by the Department of Investigation into allegations of corruption, *inter alia*, that he and his aides misused city vehicles and spied on City investigators.

12.    Jeff Thamkittikasem a white male and is currently the Chief of Staff of the DOC, a position he has held since November 2014 per assignment from Mayor DiBlasio despite having no prior experience. As Chief of Staff, he acts as the Commissioner's representative to the uniformed Command Staff, the members of DOC's executive staff and to external personnel within the New York City Mayor's Office, specifically First Deputy Mayor Anthony Shorris. He advises the Commissioner on program and policy matters, manages high priority projects, and oversees the day to-day operations of the Office of the Commissioner.

13.    Martin Murphy is a white male and was the Chief of the Department of the DOC from February 2015 until June 2017. As Chief of the Department, he supervised the uniformed members of service in the DOC, including Assistant Chiefs, Wardens, Deputy Wardens-in Command, Deputy Wardens, Assistant Deputy Wardens, Captains, and Correction Officers. He also was responsible for approving promotions and job assignments of the uniformed staff throughout the DOC.

14.    Shirvahna Gobin is a white female and is currently the Deputy Commissioner for Strategic Planning and Management of the DOC, a position she has held since 2017. At all times relevant herein, she served as the Assistant Commissioner for Strategic Planning. As Assistant Commissioner, Shirvahna Gobin was responsible for directing and overseeing policy and compliance initiatives, and for managing the administration of DOC directives, orders, rules, and regulations.

4

15.     Cynthia Brann is a white female and was named Commissioner of the DOC in October 2017. Prior to her appointment, she served as the Deputy Commissioner of Quality Assurance and Integrity for the DOC. At all times relevant herein, Cynthia Brann served under the executive direction of the Commissioner and was provided broad latitude to exercise independent judgment. She was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies and the DOC's policies and procedures. She was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

16.     Heidi Grossman is a white female and is currently the Deputy Commissioner for Legal Matters/General Counsel of the DOC, a position she has held since 2014. As Deputy Commissioner for Legal Matters/General Counsel, she serves as the legal advisor to the Executive Staff and directly supervises staff attorneys and administrative support personnel. She is responsible for formulating, directing, and supervising agency-wide policy and the policies and procedures governing the Office of the General Counsel and the DOC. She is also responsible for reviewing and implementing new and established procedure to ensure compliance with existing laws, regulations, and guidelines set by Federal, State, and City authorities.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000e-5(f)(1), 5(f)(3) and supplemental jurisdiction over the state and city law claims pursuant to 28 U.S.C. § 1367.

18.     As the Southern District is the district where a substantial part of the events giving rise to the

instant claims occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2).

19.    Plaintiffs each filed a charge with the EEOC against the City, the DOC, and the individually named Defendants, complaining of race and color discrimination, retaliation, and creation of a hostile work environment, *inter alia*, as further alleged in this Complaint.

## FACTUAL ALLEGATIONS - GENERAL

20.    In 2015, the DOC comprised approximately ten thousand four hundred (10,400) employees, eighty (80) of which were administrators and managers.

21.    The supervisory positions of administrators and managers are divided into uniformed titles and civilian titles.

22.    The uniformed titles include Chief of Department, Warden, Deputy Warden in Command, and Deputy Warden, *inter alia*.

23.    The civilian titles include Commissioner, First Deputy Commissioner, Deputy Commissioner, Associate Commissioner, and Assistant Commissioner.

24.    Only a minimal percentage of African Americans are afforded the opportunity of obtaining these supervisory positions. Unlike non-African American supervisors, the few African Americans who do hold supervisory positions have their authority circumvented, marginalized, and usurped, and are denied promotions and the opportunity to move up in the ranks.

25.    As per the most recently published New York City Government Workforce Profile Report, African Americans held only approximately twenty percent (20%) of the supervisory positions within the DOC.

26.    The prestigious upper ranks of the DOC (*i.e.* Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner, Chief of Department, and Bureau Chief) employ only one (1) African-American male. This practice of appointing minimal African Americans

to the prestigious upper ranks has permeated the DOC for years.

27.    The high ranking officers of the DOC have substantial discretion in the job selection decisions of the DOC. These officers overwhelmingly have participated or acquiesced in a culture that favors non-African American employees and fosters resistance to, and discrimination against, African Americans.

28.    The culture, policies, and practices that have caused the DOC to under-hire, under-employ, and marginalize African Americans has resulted in systemic and continuing racial discrimination in hiring, advancement, and pay decisions against African Americans employed by the DOC.

## FACTUAL ALLEGATIONS - INDIVIDUALLY NAMED PLAINTIFFS

### Plaintiff Charles Daniels

29.    Charles Daniels, an African-American male, was employed by the DOC as Senior Deputy Commissioner from January 17, 2017 to April 6, 2017, when he was forced to retire rather than be terminated.

30.    Prior to his tenure with the DOC, Charles Daniels served with distinction in a supervisory capacity at several Federal correctional facilities for over twenty (20) years. He served as the Complex Warden at both the Federal Correctional Complex ("FCC") at Terre Haute, Indiana, and the FCC at Beaumont, Texas, where he oversaw high, medium, and low security facilities with several hundred staff members, housing thousands of inmates.

31.    Throughout his career as a Complex Warden, Warden, and Associate Warden, Charles Daniels directed and controlled the spending of operating budgets in excess of one million dollars ($1,000,000.00). He achieved and maintained American Correctional Association accreditation at four (4) separate correctional facilities.

32.    As a Federal employee, Charles Daniels earned the distinction of Senior Executive Service, a

rank earned by only 0.2% of all Federal employees. He served as a primary instructor for the Board of Prisons Leadership and Management Training Program, and as Incident Commander with the National Incident Management System/Incident Command System.

33.     Despite his extensive experience and multiple distinctions, Charles Daniels had his duties and responsibilities stripped from him by Defendants, was forced to endure a constant barrage of disparaging comments, critiques, and criticisms from less qualified, non-African American subordinates, had his authority circumvented and usurped by less qualified, non-African American subordinates at the direction of Defendants, was denied the personnel and fiscal resources that less qualified, non-African American subordinates enjoyed, and was denied the official designation as Senior Deputy Commissioner. Charles Daniels worked far more extensive hours than his less qualified, non-African American counterparts, and was forced to perform substantially more tasks than his less qualified, non-African American counterparts.

34.     Upon his appointment to Senior Deputy Commissioner on January 17, 2017, Charles Daniels held higher rank than several supervisory officials, including Defendant Martin Murphy, Chief of the Department. On or about January 18, 2017, Charles Daniels met with Defendant Joseph Ponte, former Commissioner, who informed him that a dissemination regarding his designation to all DOC personnel was forthcoming. Defendant Ponte also informed Charles Daniels of the major issues he was to address, including lack of integrity at the DOC, excessive violence in the jail system, poor leadership at every level, poor training and communication, and low morale, *inter alia*. Defendant Ponte instructed Charles Daniels to pay specific attention to Defendant Murphy and warned him of Defendant Murphy's practice of directing his uniformed subordinates to disregard directives from other supervisory officials. Defendant Ponte further warned Charles Daniels to be wary of Defendant Martin's staff, as he promoted those loyal to him and eliminated those who were not.

35.     On or about February 13, 2017, Defendant Ponte instructed Charles Daniels to review the Central Operations Desk ("COD") reports, identify entries that required attention, and describe the actions that should be taken and how they will be performed. Charles Daniels was then to provide a verbal report to the Executive Staff, including Defendants Jeff Thamkittikasem, Chief of Staff, Cynthia Brann, Deputy Commissioner, Shirvana Gobi, Assistant Commissioner, and Heidi Grossman, Deputy Commissioner, all of whom held lower rank than Charles Daniels. Upon completion of his report, Charles Daniels was disparaged and told that he "did not know what he was doing," even though Defendants were less qualified and held lower rank than him. Defendants also unfairly and unjustifiably labeled Charles Daniels as "arrogant." Defendant Ponte did not address this unprofessional behavior, but rather, concurred with Defendants.

36.     Defendant Thamkittikasem has provided inaccurate and skews information regarding the violence within Rikers Island jails to the Mayor's office and inaccurately skews information regarding the DOC to the Mayor's office to meet his own agenda.

36.     After the meeting, Defendant Murphy immediately ordered his uniformed subordinates to disregard the training provided, and the directives issued, by Charles Daniels. Defendant Murphy also ordered his uniformed subordinates to cease cooperating with Charles Daniels and his Senior Advisors, and had Charles Daniels' Senior Advisors removed from their posts. Defendant Murphy would often cancel meetings with Charles Daniels and his Senior Advisors and reschedule them without any notice, even though he had been admonished previously for this behavior. Charles Daniels reported Defendant Murphy's behavior of insubordination and marginalization to Defendant Ponte, yet Defendant Ponte wholly failed to reprimand Defendant Murphy, allowing this unacceptable behavior to continue unabated.

37.     Not only was Charles Daniels forced to endure the circumvention of his authority as Senior Deputy Commissioner, but he was also forced to endure other employment conditions that his non-African American subordinates were not subject to. Charles Daniels was assigned to mentor Wardens, while

9

Defendant Murphy bore no such responsibility. Charles Daniels was also required to train the Wardens, Deputy Wardens, Assistant Chiefs, and Restrictive Housing staff on a myriad of topics, a task not required of Defendant Murphy. Many of the tasks Charles Daniels was required to perform, including drafting incident and response checklists and tour inspection checklists, were outside of his job specifications and were not required of Defendant Murphy.

38.     Even though Charles Daniels was designated Senior Deputy Commissioner on January 17, 2017, Defendant Ponte never officially announced Daniels' appointment to DOC personnel.

39.     Charles Daniels was supposed to be in charge of the "Senior Advisors" who were hired from other correctional organizations to assist DOC Wardens with professional growth, development, guidance, managerial decision making, etc. There would be 2 regularly scheduled meetings with the Advisors, Chiefs and Wardens.  Daniels discovered that Defendant Murphy would cancel all the meetings and then re-schedule them about an hour later without notifying Charles Daniels or any of the African American Senior Advisors.

40.     Despite Defendant Murphy be a subordinate to Charles Daniels,  he continued to hold meetings without advising Charles Daniels and the Black Senior Advisors causing them to be marginalized.  The Senior Advisors of African descents, including Charles Daniels were never giving the authority to perform the work they were hired to do because of Defendants' refusal to follow their recommendations and always kept out of the loop on anything and occurred within the jails.  Charles Daniels and the other Black Senior Advisors where force to listen to radio traffic for notification of violent incidents within Rikers Island so that they would could properly document the violent incident because Defendants intentionally tried to cover up the violence within Rikers Island.

41.     Charles Daniels was required to mentor several Wardens, stay late and come to work early every day, go to Rikers Island during emergencies, work on weekends, train Restrictive Housing

10

Staff, train Wardens and Deputy Wardens on incident management, do on-site leadership and supervision training, and brief the First Deputy Mayor on incidents despite having no operational authority over response protocols. However, Defendant Murphy was never required to perform such tasks despite being the Chief of Department.

42.    Turhan Gumusdere, a white male, was the Bureau Chief of Security and responsible for duty officer program. He was never held accountable for failing to have Administrative Duty Officers come in for incidents or failing to report for weekend tours of duty. However despite Charles Daniels having no authority to order informed staff to report to duty and execute duties as he would direct, Defendant Ponte would blame Daniels for the lack of effectiveness of the uniformed leadership on Mr. Daniels.

43.    Defendant Ponte told Charles Daniels that Turhan Gumusdere was caught lying about down-grading or failing to report violence within the jails yet Ponte never reprimanded Chief Gumusdere.

44.    During Charles Daniels employment with the DOC, he was asked to attend meetings at City Hall with Defendant Ponte and the First Deputy Mayor to discuss the violence statistics at Rikers Island. At one of the meetings Charles Daniels made a presentation to the First Deputy Mayor that the violence was increasing at Rikers Island. Defendant Ponte became very angry at Mr. Daniels and berated him outside the room after the meeting for not covering up the violence as they had been doing at the meetings at City Hall. Charles Daniels was never allowed to attend the City Hall meetings from that point on because he refused to inaccurately depict the violence numbers to the Mayor's Office as Defendants Ponte and Thamkittikasem wanted.

45.    On or about April 5, 2017, Charles Daniels was summoned to a meeting with Defendants Ponte, Thamkittikasem, Brand, and Grossman, at which time Defendant Ponte told Daniels that he was

"ineffective" and that "things weren't working out." Charles Daniels was *never* officially announced. Charles Daniels advised Defendant Ponte that he had never been provided operational authority and had never been officially introduced to the personnel. Charles Daniels was told that he had failed to turn in several assignments given to him by Defendant Thamkittikasem, even though Defendant Ponte specifically told him to disregard any directive given by Defendant Thamkittikasem. There was no discussion of terminating Charles Daniels at this meeting.

46.       However, it became clear to Charles Daniels that the non-African American Defendants were colluding to have him removed. As a result of the aforementioned conduct, *inter alia*, Charles Daniels filed an Office of Equal Employment Opportunity ("OEEO") complaint on April 5, 2017, alleging unlawful discriminatory practices relating to his employment, based upon race and the creation of a hostile work environment. After filing his complaint, Charles Daniels was immediately forced to resign from his position as Senior Deputy Commissioner, in retaliation for exercising his rights.

47.       On or about April 6, 2017, Charles Daniels received a telephone call from Defendant Thamkittikasem, directing him to report to Defendant Ponte's office. Defendant Ponte and Defendant Grossman were both present at the meeting. Defendant Ponte commanded Charles Daniels to "resign or be fired." Left with no other option, Charles Daniels unwillingly offered his resignation and departed the office.

48.       On June 21, 2017, Charles Daniels filed a Charge of Discrimination against the DOC with the Equal Employment Opportunity Commission ("EEOC"), alleging that the DOC had discriminated against him based upon his race and color, and that he was subject to a hostile work environment and retaliation.  He received the Right to Sue letter on or about December 11, 2017.

**Plaintiff Hakim S. El-Quhir**

49.       Hakim S. El-Quhir, an African-American male, was employed by the DOC from December

8, 1998 to April 17, 2017, when he was forced to retire under duress rather than face demotion and a significant reduction in pay.

50.     On February 1, 2016, Hakim S. El-Quhir was designated as Warden of the Transportation Division of the DOC, where he served until March 31, 2017 when he was removed from the command. Hakim S. El-Quhir was forced to retire rather than be demoted to Assistant Deputy Warden, a Civil Service title three (3) rank positions lower than Warden, with a substantially reduced salary.

51.     This ultimatum came after Hakim S. El-Quhir was reprimanded with several other white supervisors for non-satisfactory performance. However, Hakim S. El-Quhir, an African American, was the *only* supervisor forced to retire in lieu of demotion.

52.     On at least one occasion, Hakim S. El-Quhir witnessed another supervisor, a Caucasian male, being reprimanded for non-satisfactory performance. The Caucasian male was removed from the command for said non-satisfactory performance. However, unlike Hakim S. El-Quhir, he *was not* posed with the ultimatum to retire or face demotion. Rather, the Caucasian male was reassigned and sent to a newly created post even though he had significantly less experience than Hakim S. El-Quhir.

53.     Prior to the commencement of the instant action, Hakim S. El-Quhir filed an EEOC complaint against the DOC on May 1, 2015. However, he later withdrew his complaint. Hakim S. El-Quhir was also forced to resign by the DOC in retaliation for filing this EEOC complaint.

54.     Furthermore, Hakim S. El-Quhir was subjected to adverse action because Senior Executives of the DOC unjustifiably branded him as a "whistle blower" and he became a "scapegoat" wrongly blamed for notifying the media of the Senior Executives' practice of utilizing government vehicles for personal use. These adverse actions were taken because he is an African American male.

55.     On September 8, 2017, Hakim S. El-Quhir filed a Charge of Discrimination against the DOC with the EEOC, alleging that the DOC discriminated against him based upon his race and color, subjected

him to a hostile work environment, and retaliated against him.  The Right to Sue letter is pending.

**Plaintiff Clement Glenn**

56.    Clement Glenn, an African-American male, has been subjected to promotional delays, increased work hours and responsibilities, significant decreases in both personnel and fiscal resources, and an extreme loss of overtime compensation -- all adverse conditions that his similarly situated, non-African-American colleagues were not forced to endure.

57.    In or about June 2004, Clement Glenn was designated as Assistant Deputy Warden. In or about 2007, he was assigned as a Court Executive Officer, a position he held until his promotion to Deputy Warden in or around August 2011.

58.    During his tenure as a Court Executive Officer, Clement Glenn was denied cash overtime compensation, even though he consistently worked well over eight (8) hours a day. Rather, Clement Glenn's overtime was allocated as compensatory time, of which he accrued approximately two (2) years and six (6) months' time. As such, when he retires, Clement Glenn will not be compensate for this time and his pay-out will be capped at one (1) year compensatory time the remaining time will be fortified.

59.    Clement Glenn's non-African American colleagues consistently received the cash overtime opportunities and compensation that Clement Glenn has been denied.

60    Clement Glenn's promotion to Deputy Warden was delayed seven (7) years, a delay his non-African American Assistant Warden colleagues did not experience. During those seven (7) years, Clement Glenn consistently saw non-African American Assistant Wardens promoted to Deputy Warden within two (2) years of their designation as Assistant Warden. When he finally was promoted to Deputy Warden, Clement Glenn spent the entirety of his current tenure assigned to the jails, while the non-African American Deputy Wardens and their non-African American subordinates were either quickly promoted to, or transferred into, high levels of management with little to no inmate interaction. Despite these restrictions,

14

Clement Glenn received numerous accolades from the Executive Staff for his performance as a Deputy Warden.

61.     Upon his promotion to Warden, Clement Glenn was immediately subject to personnel and fiscal restrictions that his non-African American predecessors and contemporaries were not subject to. His staff was reduced significantly while his responsibilities continued to increase. He experienced an intensified level of scrutiny and tactics aimed at marginalizing him, which were not experienced by his non-African American predecessors and contemporaries. These restrictions and increased responsibilities culminated in the imposition of a housing violation against Clement Glenn in or about March 2016.

62.     Following the housing unit violation, Clement Glenn was immediately transferred to the Criminal Justice Bureau and then to the Hospital Prison Ward. In or about August 2016, he was transferred to the West Facility, where he again was afforded only minimal staff, resources, and support. While Clement Glenn was out on Family Medical and Leave Act ("FMLA") leave in or about December 2016, a non-African American Warden was temporarily assigned Clement Glenn's command. This non-African American Warden received the additional staff and support that Clement Glenn had been denied. Upon Clement Glenn's return from FMLA leave, these additional resources were immediately removed from his command. Despite the continued increase in the inmate population at Clement Glenn's command, his staff resources were, and continue to be, consistently reduced.

63.     During his tenure with the DOC, Clement Glenn has experienced an environment where his non-African American subordinates wield significant power and control over him. These non-African American subordinates are promoted more quickly and into more prominent positions than Clement Glenn and his African American contemporaries. The non-African American subordinates are provided more overtime opportunities and receive significantly more compensation than Clement Glenn and his African American contemporaries. Clement Glenn is required to work longer hours and take on substantially more

responsibilities with less resources and compensation than his non-African American subordinates and contemporaries.

64.    On September 8, 2017, Clement Glenn filed a Charge of Discrimination against the DOC with the New York State Department of Human Resources ("NYSDHR") and the EEOC alleging that the DOC subjected him to discrimination based upon unlawful and intentional patterns and practices of race and color discrimination, retaliation, and creation of a hostile work environment. The Right to Sue letter is pending.

**Plaintiff Keith Taylor**

65.    Keith Taylor, an African American male, was employed by the DOC as the Assistant Commissioner of the Intelligence Bureau from February 4, 2015 until his forced resignation on February 28, 2017.

66.    Prior to his employment with the DOC, Keith Taylor served as an officer for the NYPD for over twenty-four (24) years, earning the rank of Sergeant with the Emergency Medical Unit.

67.    Upon his appointment as Assistant Commissioner, Keith Taylor was assigned to the Correction Intelligence Bureau ("CIB"). While at CIB, Keith Taylor created the Evidence Collection/Crime Scene Unit, the Intelligence Analysis Unit, the Social Media Monitoring Unit, and the Phone Monitoring Unit. Keith Taylor implemented these units to address the shortcomings of CIB that had been detailed in an administrative report.

68.    Throughout his tenure as Assistant Commissioner, Keith Taylor repeatedly requested additional personnel and equipment resources that his non-African American colleagues had been provided. However, as of the date of his forced resignation, those requests had all been unmet by Defendants Murphy and Turhan Gumusdere, Chief of Security. Keith Taylor had also been denied a budget for those resources while other Assistant Commissioners enjoyed such a budget.

69.    In or about April 2016, CIB was transferred back under uniform command following an incident where an inmate splashed a Correction Officer in the face with an unknown liquid. Keith Taylor was removed from his supervisory position at CIB even though he was told that he had not done anything wrong. Defendant Gumusdere advised Keith Taylor that he would be supervising all uniformed staff activities. The uniformed staff stopped taking directives from Keith Taylor and stopped reporting to him. He was excluded from all Executive meetings.

70.    Uniformed staff was commanded to disregard Keith Taylor's directives. Representatives from outside government agencies were also advised to discontinue their relationships with Keith Taylor. His Administrative Assistant transferred to another command after hearing officers within CIB disparage him. In essence, Keith Taylor was stripped of all authority and responsibilities within CIB.

71.    In addition to the loss of his supervisory powers, Keith Taylor had his parking space rescinded and his portrait removed from its proper place in the Fusion Center.

72.    No other non-African American Assistant Commissioners were subject to such unprofessional and disrespectful measures as described above.

73.    Soon thereafter, Defendants Murphy and Gumusdere advised Keith Taylor that Commissioner Joseph Ponte approved a directive requiring Keith Taylor to report to Deputy Warden Smalls. Deputy Warden Smalls was then promoted to Warden and Commanding Officer of CIB and took control over both the uniformed and civilian staff, completely removing any and all authority from Keith Taylor.

74.    On February 24, 2017, Keith Taylor reported to Defendant Thamkittikasem's office and was asked for his letter of resignation, despite having not received any written or verbal notice that the work he performed was inadequate or deficient in any way.

75.    On June 21, 2017, Keith Taylor filed a Charge of Discrimination with the NYSDHR and the

17

EEOC, alleging that the DOC discriminated against him based upon its unlawful and intentional pattern and practice of race and color discrimination, retaliation, and the creation of a hostile work environment.

76.      On or about September 22, 2017, Keith Taylor received a Right to Sue Letter from the EEOC.

**Plaintiff Errol Toulon, Jr.**

77.      Errol Toulon, Jr., an African-American male, was employed by the DOC as Deputy Commissioner of Operations from on or about July 2014 until his forced resignation on January 5, 2017.

78.      Prior to his tenure with the DOC, Errol Toulon, Jr. served with distinction as the Suffolk County Assistant Deputy County Executive for Public Safety from September 2012 to July 2014. As Assistant Deputy County Executive, he was required to report and advise directly to the County Executive on all matters of public safety and security. During his career in Suffolk County, Errol Toulon developed initiatives and policies to combat drug addiction and gang violence, created and managed new security procedures and surveillance systems, and created initiatives to reduce recidivism and increase organizational accountability, *inter alia*. He was appointed to oversee all security procedures and protocols for all County facilities and was appointed Incident Commander for any natural disaster or terrorist attack within Suffolk County.

79.      Errol Toulon, Jr. also served the DOC with distinction for over twenty-two (22) years until his retirement as Captain in 2004. During his career with the DOC, Errol Toulon, Jr. handled all aspects of Department operations, including budgeting, recruiting, training, resource management and relationships with law enforcement groups and government offices. He directed and controlled the spending of operating budgets in excess of two million five hundred thousand dollars ($2,500,000.00). He received numerous awards and citations for his performance.

80.      Upon reentering the DOC as Deputy Commissioner of Operations in 2014, Errol Toulon, Jr.

immediately began to experience discrimination. He was denied both a residency and pension waiver while other non-African American subordinates were approved. He was forced to choose one (1) location for his office, while his non-African American predecessor was afforded two (2) office locations.

81.    Despite his extensive experience and multiple distinctions, Errol Toulon, Jr.'s authority was constantly questioned and usurped by non-African American staff members. His command, the Central Intelligence Bureau (CIB), was given exorbitant responsibilities, but was denied adequate personnel and fiscal resources to fulfill the responsibilities. Errol Toulon, Jr. had his office space and staff greatly diminished, while other non-African American executives' staffing needs were increased. When he requested additional staff resources, Errol Toulon, Jr. was told that the vetting process was extensive. However, during this period, non-African American Deputy Commissioners requested, and were promptly provided, additional staff resources.

82.    After being given additional responsibilities with the Quality Assurance and Integrity Unit, Errol Toulon, Jr. was denied the requisite staffing resources. When he was relieved of these responsibilities, his replacement, a non-African American female, was afforded the staffing resources he had previously been denied. The DOC then transferred Errol Toulon, Jr.'s Executive Officers to other commands per the request of subordinate officers. Non-African American Deputy Commissioners were not forced to relinquish executive members to lower ranking officers.

83.    Following an incident where the Bronx District Attorney declined to prosecute an inmate who had accosted a corrections officer, Errol Toulon Jr. was made the scapegoat and was retaliated against. The non-African American Executive Staff stripped him of his responsibilities overseeing the CIB. He was banished to an office separate from the non-African American Deputy Commissioners and had his staff displaced.

84.    On January 5, 2017, Errol Toulon Jr. was forced to resign after again serving as the DOC's

19

scapegoat. His forced resignation was in retaliation for the DOC's failure to hire the number of correction officers mandated by the Mayor of New York City, even though Toulon had not been provided the appropriate resources to make this a reality. He was blacklisted from meetings and had the candidate list withheld from him for months, making hiring a virtual impossibility. Soon thereafter, Errol Toulon Jr. was forced to resign, despite never receiving a performance evaluation or being informed that he was not performing at a satisfactory level.

85.     On June 21, 2017, Errol Toulon Jr. filed a Charge of Discrimination with the NYSDHR and the EEOC and received the Right to Sue letter on or about October 16, 2017.

### FACTUAL ALLEGATIONS - CONCLUSION

86.     For years, Plaintiffs attempted to ignore the discriminatory practices within the DOC. They falsely believed that if they simply continued to excel and receive outstanding evaluations, their accomplishments would eventually be recognized. But after years of being passed up for promotions while less qualified non-African American employees were advanced above them, and having their authority and decision-making power marginalized, circumvented, and usurped, Plaintiffs have come to the painful realization that their race matters more to the DOC than their achievements or records of service. Every time Plaintiffs were passed up for desirable assignments, denied transfers into desirable units, given low-visibility positions, had their authority removed from them, and denied the rank and prestige that comes with promotions, they paid a price.

87.     Plaintiffs suffered a powerful emotional toll. Plaintiffs devoted significant time and energy into the DOC and took tremendous pride in their work. However, they have been forced to acknowledge the humiliating and degrading reality that ultimately, their records of achievement and lengthy years of service mattered less to the DOC than the color of their skin.

88.     The monetary loss that Plaintiffs and other African-American employees in the DOC

suffered is great. They lost tens of thousands of dollars each year when they were not promoted, and hundreds of thousands of dollars after being forced to either resign or retire, resulting in significantly smaller pensions.

89.     There is a stark and unjustifiable under-representation of African Americans in the supervisory ranks of the DOC. The pervasively discriminatory environment in which Plaintiffs and other African Americans were forced to work has caused them substantial harm and will continue to harm all other African American members of the DOC who are never given the opportunity to advance within it.

## FIRST CAUSE OF ACTION
(Unlawful Discrimination – Title VII, 42 U.S.C. § 2000e *et seq.*)

90.     Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

91.     Defendant City is an employer as defined in Title VII, and at all relevant times herein, employed Plaintiffs.

92.     Defendant City discriminated against Plaintiffs in violation of 42 U.S.C. § 2000-e2(a), based upon race and color by denying or delaying promotions, and/or forcing them to resign, therefore giving them less pay and rank as compared to less qualified, non-African American employees.

93.     This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

94. As a result of Defendant City's discrimination, Plaintiffs suffered and continue to suffer damages, including but not limited to lost income, and mental anguish, pain and suffering. They are also entitled to attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS

($10,000,000.00).

## SECOND CAUSE OF ACTION
(Unlawful Discrimination – New York Executive Law § 296)

95.     Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

96.     The acts described above constitute unlawful discriminatory employment practices that violate Section 296 of the New York Executive Law.

97.     Defendant City discriminated against Plaintiffs by failing to promote them, marginalizing them, and forcing them to resign or retire due to their race and color.

98.     This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

99.     As a result of Defendants' discrimination, Named Plaintiffs have been damaged and are entitled to compensatory damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## THIRD CAUSE OF ACTION
(Unlawful Discrimination-N.Y.C. Admin. Code §§ 8-101 *et seq.*)

100.     Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

101.     The New York City Administrative Code is explicit that the City Human Rights Law "be

construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and that exceptions and exemptions "be construed narrowly in order to maximize the deterrence of discriminatory conduct." N.Y.C. Admin. Code § 8-130(a)-(b).

102. The acts described above constitute unlawful discriminatory employment practices that violate Section 8-107 of the New York City Administrative Code.

103. All Defendants unlawfully discriminated against Plaintiffs by denying them promotions due to their race, removing their power and authority as supervisors due to their race and color, providing them less resources due to their race and color, and ultimately forcing them to either resign or retire due to their race and color, therefore giving them less pay, authority, and/or rank as compared to less qualified non-African American supervisors.

104. This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

105. As a result of Defendants' discrimination, Plaintiffs have been damaged and are entitled to compensatory damages, punitive damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## FOURTH CAUSE OF ACTION
(42 U.S.C. §1983 Against All Individual Defendants)

106. Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

107. All of the acts and conduct of the Individual Defendants and Defendant CITY, by and though its agents, herein stated were done under color of state law, while in the performance of their duties as Supervisors for the DOC.

108. The facts and circumstances cited above are in violation of Plaintiffs' Fourteenth Amendment right under the Equal Protection Clause of the United States Constitution to be free from retaliation, discrimination and harassment in his employment with the CITY and DOC.

109. That Individual Defendants actions, as alleged herein, were committed under color of State law.

110. That Individual Defendants did conspire to violate Plaintiffs' Constitutional rights by actually depriving them of entitlement to promotions, overtime, staffing and to be free of harassment and retaliation within the work place, and other pension rights.

111. That Individual Defendants did willfully and knowingly make false claims against the Plaintiffs with the intent of causing Plaintiffs to be marginalized, constructively discharged and/or demoted.

112. That Defendants maliciously and vindictively evaluated Plaintiff's performance in a negative matter solely because of their race and color so that they would be denied an executive staff position within DOC.

113. That despite Defendants' knowledge that Plaintiffs were well qualified to perform their responsibilities within DOC they nevertheless forced them to endure the aforementioned employment conditions under duress knowing that they were capable of performing the duties of an executive officer within DOC, Plaintiffs were the victims of wrongful constructive discharge and/or demotion from the DOC and denied the benefits of working for the DOC.

114.    Plaintiffs were denied their Constitutional rights pursuant to the Fourteenth Amendment in violation of their equal protection and due process.

115.    That as a direct and proximate result of the aforementioned conduct of the Individual Defendants, Plaintiffs were deprived of their property rights, all in violation of their rights under the Fourteenth Amendment rights to equal protection and due process under 42 U.S.C. §1983 to the United States Constitution.

116.    That as a direct and proximate result of the foregoing, Plaintiffs sustained injury and damage consisting of loss of property, economic damages, legal expenses and emotional distress for which Defendants are liable.

117.    By reason of the foregoing, Individual Defendants have violated §1983, and Plaintiffs are entitled to economic, emotional and compensatory damages in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00); and punitive damages against the individual Defendants in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

**JURY DEMAND**

118.    Plaintiffs hereby demand a trial by jury in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and award the following relief:

(1)    A judgment declaring that Defendants have committed the violations of law alleged in this action;

(2)    An order granting appropriate injunctive relief and declaratory relief for a period of time to

be determined by the Court;

(3)    Actual or compensatory damages against all Defendants in an amount not less than TEN

MILLION DOLLARS ($10,000,000.00) for each cause of action;

(4)    Punitive damages against Individual Defendants in an amount TEN MILLION DOLLARS

($10,000,000.00);

(5)    Reasonable attorneys' fees and costs; and

(6)    Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

Rocco G. Avallone
AVALLONE & BELLISTRI, LLP
*Attorneys for Plaintiffs*
3000 Marcus Avenue
Suite 3E07
Lake Success, New York 11042
(516) 986-2501

26