UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES DANIELS, KEITH TAYLOR, ERROL TOULON, JR., HAKIM S. EL-QUHIR, CLEMENT GLENN, ANTHONY TOULON, individually and on behalf of all others similarly situated,<br><br>                                Plaintiffs,<br><br>             -against-<br><br>THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF CORRECTIONS, CYNTHIA BRANN, Commissioner, JOSEPH PONTE, former Commissioner, JEFF THAMKITTIKASEM, Chief of Staff, and  MARTIN MURPHY, former Chief of Department.<br><br>                       Defendants. | **Case No.** 17 Civ. 9960 (LGS)<br><br><br>**AMENDED COMPLAINT WITH JURY DEMAND** |

Charles Daniels, Keith Taylor, Errol Toulon, Jr., Hakim S. El-Quhir, Clement Glenn, and Anthony Toulon (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, for their Amended Complaint against Defendants the City of New York, New York City Department of Corrections, Cynthia Brann, Commissioner, Joseph Ponte, former Commissioner, Jeff Thamkittikasem, Chief of Staff, and Martin Murphy, former Chief of Department (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.      This action seeks to vindicate the rights of Plaintiffs, African American Executive Staff and/or supervisory employees, both current and former, of the New York City Department of Corrections ("DOC"), who have been denied or delayed promotions, and/or were terminated or forced to resign, and/or were subject to adverse employment conditions based upon their race and color, as well as their staunch

refusal to engage in the prevalent corruption, falsification and manipulation of incidents of violence within Rikers Island, for which the Plaintiffs suffered a disparate impact when compared with similarly situated non-African American employees.

2.     As set forth more fully below, Plaintiffs allege in this action that Defendants the City of New York ("City") and the individually-named Defendants, as current and former DOC Executive Staff, have engaged in a pattern and practice of race discrimination and retaliation based upon, *inter alia*: 1) failure to promote African American supervisors within the DOC; 2) failure to provide African American supervisors with the appropriate equipment, fiscal, and personnel resources that were provided to similarly-situated, non-African American employees; 3) the marginalization of African American supervisors; 4) forcing several African American supervisors to resign or retire in lieu of threatened termination or demotion; and 5) the disparate impact upon the African American plaintiffs who all refused to take part in the systemic corruption and falsification tactics undertaken by Defendants.

3.     For years, Defendants have engaged in a pattern and practice of systemic, continuous, and intentional discrimination against African American administrative and management employees in job placement, advancement opportunities, and compensation decisions. Defendants have denied African Americans the same advancement opportunities as have been afforded to non-African Americans, resulting in a *severe underrepresentation* of African Americans on the DOCS Executive Staff. This broad pattern of racial discrimination has resulted in a far less percentage of African American Executive Staff members at the DOC as compared to other City government agencies.

4.     Despite repeated attempts by Plaintiffs, and numerous other similarly situated African American supervisory employees, 1) to curtail this severe and pervasive discrimination, and 2) refusal to undertake in the falsification and manipulation of facts regarding violence within Rikers Island by, *inter alia*, reporting the repeated instances of discrimination and corruption to their supervisors, the Office of

Equal Employment Opportunity, and DOC Executive Staff, Defendants utterly failed to take appropriate corrective actions and permitted the hostile work environment to persist unabated during their employment.

5.      The African American Plaintiffs all suffered a similar fate when they voiced their concerns to Defendants: Their complaints were wholly ignored, their authority and decision-making responsibilities were removed, their equipment, fiscal, and personnel resources were severely restricted, and/or their voices were completely stifled as they were forced to retire or resign.

6.      Plaintiffs bring this action on behalf of themselves and all other similarly situated supervisory employees. Plaintiffs herein claim that the DOC's pattern and practice of discrimination based upon race and color, violates Title VII, 42 U.S.C. § 2000e *et seq.,* 42 U.S.C. § 1983, Section 296 of the New York Executive Law, and Section 8-107 of the New York City Administrative Code.

## PARTIES

### *Named Plaintiffs*

7.      Plaintiff Charles Daniels served as Senior Deputy Commissioner of the DOC from January 2017 until his forced resignation in April 2017. At all times relevant to the factual allegations contained within in this Amended Complaint, Charles Daniels lived in Long Island City, New York.

8.      Plaintiff Keith Taylor was employed by the DOC from February 2015 until his forced resignation on February 28, 2017. Prior to his resignation, he served as Assistant Commissioner. He currently resides in New York, New York.

9.      Plaintiff Errol Toulon, Jr. served as Deputy Commissioner of Operations of the DOC from July 2014 until his forced resignation in January 2017. He currently resides in Lake Grove, New York.

10.     Plaintiff Hakim S. El-Quhir is a twenty-eight (28) year veteran of the DOC. He was forced to retire in April 2017. He currently resides in Wyandanch, New York.

3

11.     Plaintiff Clement Glenn has been employed by the DOC in a supervisory capacity since June 2004. He currently serves as Warden of the Rikers Island West Facility. He resides in St. Albans, New York.

12.     Plaintiff Anthony Toulon has been employed by the DOC since July 29, 1984 and currently holds the rank of Deputy Warden. He resides in Pomona, New York.

### ***Defendants***

#### The City of New York

13.     The City of New York ("City") is a municipal corporation existing by the virtue of the laws of the State of New York. The City, through the Department of Corrections ("DOC"), maintains a policy and practice of discrimination against African American employees, including the creation of a disparate impact against the African Americans Plaintiffs who have refused to partake in the corruption and falsification/manipulation of statistics within DOC.

14.     The City is liable for the discrimination suffered by Plaintiffs and similarly situated African American employees.

#### Defendant Cynthia Brann

15.     Cynthia Brann is a white female and was named Commissioner of the DOC in October 2017. Prior to her appointment, Defendant Brann served as the Deputy Commissioner of Quality Assurance and Integrity for the DOC. At all times relevant herein, Defendant Brann served under the executive direction of Defendant Ponte, the former Commissioner of DOC, and was provided broad latitude to exercise independent judgment.

16.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Brann was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules

4

and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Brann was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

17.     It is alleged herein that Defendant Brann willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

Defendant Joseph Ponte

18.     Joseph Ponte is a white male and was the Commissioner of the DOC from April 2014 until May 2017.

19.     As Commissioner, Defendant Ponte was responsible for the development, implementation, and enforcement of all DOC practices and policies. Defendant Ponte was likewise responsible for the training and supervision of DOC personnel and the overall administration of DOC facilities.

20.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Ponte was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Ponte was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the

initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

21.     It is alleged herein that Defendant Ponte willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

22.     Defendant Ponte retired in May 2017 amid an investigation by the Department of Investigation into allegations of corruption, *inter alia*, that he and his aides misused City vehicles and spied on City investigators.

Defendant Jeff Thamkittikasem

23.     Jeff Thamkittikasem is an Asian male who is currently the Chief of Staff of the DOC, a position he has held since November 2014 per assignment from Mayor Bill de Blasio, despite having no prior corrections experience.

24.     As Chief of Staff, Defendant Thamkittikasem acts as the Commissioner's representative to the uniformed Command Staff, the members of DOC's Executive Staff and to external personnel within the New York City Mayor's Office, specifically First Deputy Mayor Anthony Shorris. Defendant Thamkittikasem advises the Commissioner on program and policy matters, manages high priority projects, and oversees the day to-day operations of the Office of the Commissioner.

25.     It is alleged herein that Defendant Thamkittikasem willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

Defendant Martin Murphy

26.    Martin Murphy is a white male and was the Chief of the Department of the DOC from February 2015 until June 2017 when he retired.

27.    As Chief of the Department, Defendant Murphy supervised the uniformed members of service in the DOC, including Assistant Chiefs, Wardens, Deputy Wardens-In-Command, Deputy Wardens, Assistant Deputy Wardens, Captains, and Correction Officers. Defendant Murphy also was responsible for approving promotions and job assignments of the uniformed staff throughout the DOC.

28.    Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Murphy was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Murphy was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

29.    It is alleged herein that Defendant Murphy willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over Plaintiffs' Federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000e-5(f)(1), 5(f)(3) and supplemental jurisdiction over the state and city law claims pursuant

to 28 U.S.C. § 1367.

31.     As the Southern District is the District wherein a substantial part of the events giving rise to the instant claims occurred, venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

32.     Plaintiffs each filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the City, the DOC, and the individually named Defendants, complaining of race and color discrimination, retaliation, and creation of a hostile work environment, *inter alia*, as further alleged in this Amended Complaint.

## FACTUAL ALLEGATIONS - GENERAL

33.     At all relevant times, the DOC comprised approximately ten thousand four hundred (10,400) employees, eighty (80) of which were administrators and managers.

34.     The supervisory positions of administrators and managers are divided into uniformed titles and civilian titles.

35.     The uniformed titles include Chief of Department, Warden, Deputy Warden-In-Command, and Deputy Warden, *inter alia.*

36.     The civilian titles include Commissioner, First Deputy Commissioner, Deputy Commissioner, Associate Commissioner, and Assistant Commissioner.

37.     The Executive Staff is comprised of the Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner of Financial, Facility and Fleet Administration, Deputy Commissioner for Legal Matters/General Counsel, Deputy Commissioner of Public Information, First Deputy Commissioner of Human Resources, Deputy Commissioner of Youthful Offender and Young Adult Programming, Deputy Commissioner for the Office of Classification and Population Management, Deputy Commissioner of Adult Programming and Community Partnerships, Deputy Commissioner of Quality Insurance and Integrity, Chief Information Officer/Deputy Commissioner of

Information Technology, Deputy Commissioner of Health Affairs, and Deputy Commissioner for Investigation Division.

38.     At all relevant times, a disproportional percentage of African Americans were afforded the opportunity of obtaining Executive Staff positions.

39.     Unlike non-African American supervisors, the few African Americans who do hold supervisory positions have their authority circumvented, marginalized, and usurped, are denied promotions and the opportunity to move up in the ranks, and/or are threatened with demotion if they fail to resign.

40.     Furthermore, the African American Plaintiffs suffered a disparate impact at the hands of Defendants, all because Plaintiffs refused to acquiesce to the corruption, manipulation and falsification of DOCS statistics, in particular, jail violence. Said corruption, manipulation and falsification was instituted, promoted and required by Defendants. Any deviation resulted in adverse employment actions by Defendants.

41.     A New York City Government Workforce Profile Report shows that, at times relevant to this Amended Complaint, "Black" employees held only approximately thirty (30%) of the managerial positions within the DOC, despite over seventy-five percent (75%) overall "Black" employment.

42.     At all relevant times, the prestigious upper ranks of the DOC (*i.e.* Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner, Chief of Department, and Bureau Chief) employed only one (1) African American male. This practice of appointing minimal African Americans to the prestigious upper ranks has permeated the DOC for years.

43.     The high-ranking officers of the DOC have substantial discretion in the job selection decisions of the DOC. These officers overwhelmingly have participated or acquiesced in a culture that favors non-African American employees and fosters resistance to, and discrimination against, African Americans.

44.     The culture, policies, and practices that have caused the DOC to under-promote and marginalize African Americans has resulted in systemic and continuing racial discrimination, including disparate impact, in hiring, advancement, and pay decisions against African Americans employed by the DOC.

## FACTUAL ALLEGATIONS - INDIVIDUALLY NAMED PLAINTIFFS

### Plaintiff Charles Daniels

45.     Charles Daniels, an African-American male, was employed by the DOC as Senior Deputy Commissioner from January 17, 2017 to April 6, 2017, when he was forced to retire rather than be terminated.

46.     Prior to his tenure with the DOC, Charles Daniels served with distinction in a supervisory capacity at several Federal correctional facilities for over a period of twenty (20) years. Charles Daniels served as the Complex Warden at both the Federal Correctional Complex ("FCC") at Terre Haute, Indiana, and the FCC at Beaumont, Texas, where he oversaw high, medium, and low security facilities with several hundred staff members, housing thousands of inmates.

47.     Throughout his career as a Complex Warden, Warden, and Associate Warden, Charles Daniels directed and controlled the spending of operating budgets in excess of one million dollars ($1,000,000.00). Charles Daniels achieved and maintained American Correctional Association accreditation at four (4) separate correctional facilities.

48.     As a Federal employee, Charles Daniels earned the distinction of Senior Executive Service, a rank earned by only 0.2% of all Federal employees. Charles Daniels served as a primary instructor for the Board of Prisons Leadership and Management Training Program, and as Incident Commander with the National Incident Management System/Incident Command System.

49.     Despite his extensive experience and multiple distinctions, Charles Daniels had his duties and responsibilities stripped from him by Defendants Ponte, Thamkittikasem, and Murphy, was forced to endure a constant barrage of unwarranted, disparaging comments, critiques, and criticisms from less qualified, non-African American subordinates including Defendants Thamkittikasem, Brann, and Murphy, had his authority circumvented and usurped by less qualified, non-African American subordinates at the direction of Defendants Thamkittikasem, Brann, and Murphy, was denied the personnel and fiscal resources enjoyed by less qualified, non-African American subordinates, such as Defendants Thamkittikasem, Brann, and Murphy, and was unfairly denied the official designation as Senior Deputy Commissioner by Defendant Commissioner Ponte.

50.     Charles Daniels worked far more extensive hours than his less qualified, non-African American counterparts, namely Defendants Thamkittikasem, Brann and Murphy, and was forced to perform substantially more tasks than his these non-African American individuals.

51.     Upon his "appointment" to Senior Deputy Commissioner on January 17, 2017, Charles Daniels *held higher rank* than several supervisory officials, including Defendants Thamkittikasem, Brann, and Murphy. On or about January 18, 2017, Charles Daniels met with Joseph Ponte, former Commissioner, who informed him that a dissemination regarding his designation to all DOC personnel was forthcoming. Defendant Ponte also informed Charles Daniels of the major issues he was to address, including lack of integrity at the DOC, excessive violence in the jail system, poor leadership at every level, poor training and communication, and low morale, *inter alia*. Defendant Ponte explicitly instructed Charles Daniels to pay specific attention to Defendant Murphy and warned him of Defendant Murphy's practice of directing his uniformed subordinates to disregard directives from other supervisory officials.

52.     On or about February 13, 2017, Defendant Ponte instructed Charles Daniels to review the Central Operations Desk ("COD") reports, identify entries that required attention, and describe the actions

11

that should be taken and how they will be performed. Charles Daniels was then to provide a verbal report to the Executive Staff, including Defendant Murphy, Defendant Thamkittikasem, Chief of Staff, Defendant Brann, Deputy Commissioner, Shirvana Gobin, Deputy Commissioner for Strategic Planning and Management, and Heidi Grossman, Deputy Commissioner for Legal Matters/General Counsel, all of whom are white and held *lower rank* than Charles Daniels. Upon completion of his report, Charles Daniels was disparaged and told by Defendants Thamkittikasem and Brann that he "did not know what he was doing," even though Defendants were less qualified and held lower rank than him.

53.     Defendants Thamkittikasem, Brann, and Murphy also unfairly and unjustifiably labeled Charles Daniels as "arrogant."

54.     Defendant Ponte failed to address this unprofessional behavior, but rather, allowed the other Defendants to usurp Plaintiff Daniels' authority.

55.     After the meeting, Defendant Murphy immediately ordered his uniformed subordinates to disregard the training provided, and the directives issued, by his superior, Plaintiff Daniels. Defendant Murphy also ordered his uniformed subordinates to cease cooperating with Daniels and his Senior Advisors, and had Daniels' Senior Advisors removed from their posts.

56.     Defendant Murphy would often cancel meetings with Plaintiff Daniels and his Senior Advisors and reschedule them without any notice, even though he had been admonished previously for this behavior.

57.     Plaintiff Daniels reported Defendant Murphy's behavior of insubordination and marginalization to Defendant Ponte, yet Defendant Ponte wholly failed to reprimand Defendant Murphy, allowing this unacceptable behavior to continue unabated. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

58.     Not only was Plaintiff Daniels forced to endure the circumvention of his authority as Senior

12

Deputy Commissioner, but he was also forced to endure other employment conditions that his non-African American subordinates were not subject to.

59. Plaintiff Daniels was assigned to mentor Wardens, while Defendant Murphy bore no such responsibility.

60. Plaintiff Daniels was also required to train the Wardens, Deputy Wardens, Assistant Chiefs, and Restrictive Housing staff on a myriad of topics, a task not required of Defendant Murphy.

61. Many of the tasks Plaintiff Daniels was required to perform, including drafting incident and response checklists and tour inspection checklists, were outside of his job specifications and were not required of Defendant Murphy.

62. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

63. Even though Plaintiff Daniels was designated Senior Deputy Commissioner on January 17, 2017, Defendant Ponte never officially announced Daniels' appointment to DOC personnel. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

64. Plaintiff Daniels was supposed to be in charge of the "Senior Advisors" who were hired from other correctional organizations to assist DOC Wardens with professional growth, development, guidance, managerial decision making, etc. There would be two regularly scheduled meetings with the Advisors, Chiefs and Wardens. Plaintiff Daniels discovered that Defendant Murphy would cancel all the meetings and then re-schedule them about an hour later without notifying Daniels or any of the African American Senior Advisors. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

65. Despite being a subordinate to Plaintiff Daniels, Defendant Murphy continued to hold

13

meetings without advising Daniels and the African American Senior Advisors, causing them to be marginalized.

66.     The Senior Advisors of African descent, including Plaintiff Daniels, were never given the authority to perform the work they were hired to do because of Defendants Thamkittikasem, Brann, and Murphy's refusal to follow the African American Plaintiffs' recommendations, and the fact that Defendants always kept the African American supervisors "out of the loop" and "in the dark" on matters that occurred within the jails.

67.     Because Defendants Thamkittikasem, Brann, and Murphy intentionally tried to cover up the violence within Rikers Island and keep African American supervisors "in the dark" regarding occurrences of violence, Plaintiff Daniels and the other African American Senior Advisors where forced to listen to "radio traffic" for notification of violent incidents in order to properly document violent incidents.

68.     Unlike his non-African American counterparts such as Defendant Murphy, *inter alia*, Plaintiff Daniels was required to mentor several Wardens, stay late and come to work early every day, go to Rikers Island during emergencies, work on weekends, train Restrictive Housing Staff, train Wardens and Deputy Wardens on incident management, do on-site leadership and supervision training, and brief the First Deputy Mayor on incidents, all despite having no operational authority over response protocols. Defendant Murphy was never required to perform such tasks despite being Chief of Department.

69.     Turhan Gumusdere, a white male, was the Bureau Chief of Security and responsible for the Duty Officer Program. Chief Gumusdere was never held accountable for failing to have Administrative Duty Officers come in for incidents or failing to report for weekend tours of duty. Despite Plaintiff Daniels having no authority to order unformed staff to report to duty and execute duties as he would direct, Defendant Ponte would blame Daniels for lack of effectiveness of the uniformed leadership. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working

14

conditions.

70.    Defendant Ponte told Plaintiff Daniels that Chief Gumusdere was caught lying about down-grading or failing to report violence within the jails, yet Ponte never reprimanded Chief Gumusdere.

71.    During Plaintiff Daniels employment with the DOC, he was asked to attend meetings at City Hall with Defendant Ponte and the First Deputy Mayor to discuss violence statistics at Rikers Island. At one of the meetings, Daniels made a presentation to the First Deputy Mayor that the violence was increasing at Rikers Island. Defendant Ponte became very angry at Mr. Daniels, berating him outside the room after the meeting for not covering up the violence in the meeting at City Hall. Daniels was never allowed to attend the City Hall meetings from that point on because he refused to inaccurately depict the numbers of violent incidents to the Mayor's Office as Defendants Ponte and Thamkittikasem wanted. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions. This was witnessed by one of the Deputy Commissioners.

72.    On or about April 5, 2017, Plaintiff Daniels was summoned to a meeting with Defendants Ponte, Thamkittikasem, Brann, and Heidi Grossman, at which time Defendant Ponte told Daniels that he was "ineffective" and that "things weren't working out."

73.    To this point, Plaintiff Daniels was *still never* officially announced as Senior Deputy Commissioner by Defendant Ponte who refused to do so.

74.    Plaintiff Daniels advised Defendant Ponte that he had never been provided operational authority and had never been officially introduced to the personnel. Plaintiff Daniels was told that he had failed to turn in several assignments given to him by Defendant Thamkittikasem, even though Defendant Ponte specifically told him to disregard any directive given by Defendant Thamkittikasem. There was no discussion of terminating Plaintiff Daniels at this meeting.

75.    It became clear to Plaintiff Daniels that the non-African American Defendants were

15

colluding to have him removed. As a result of the aforementioned conduct, *inter alia*, Daniels filed an Office of Equal Employment Opportunity ("OEEO") complaint on April 5, 2017, alleging unlawful discriminatory practices relating to his employment, based upon race and the creation of a hostile work environment.

76.     After filing his OEEO complaint, Plaintiff Charles Daniels was immediately forced to resign from his position as Senior Deputy Commissioner, in retaliation for exercising his rights.

77.     On or about April 6, 2017, Charles Daniels received a telephone call from Defendant Thamkittikasem, directing him to report to Defendant Ponte's office. Defendant Ponte and Heidi Grossman were both present at the meeting. Defendant Ponte commanded Charles Daniels to "resign or be fired." Left with no other option, Plaintiff Daniels unwillingly offered his resignation and departed the office. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

78.     On June 21, 2017, Plaintiff Charles Daniels filed an EEOC Charge of Discrimination against the DOC, alleging that the DOC had discriminated against him based upon his race and color, and that he was subjected to a hostile work environment and retaliation. Daniels received a Right to Sue letter from the EEOC on or about December 11, 2017.

**Plaintiff Keith Taylor**

79.     Keith Taylor, an African American male, was employed by the DOC as the Assistant Commissioner from February 4, 2015 until his forced resignation on February 28, 2017.

80.     Prior to his employment with the DOC, Plaintiff Taylor served as an officer for the NYPD for over twenty-four (24) years, earning the rank of Sergeant with the Emergency Medical Unit.

81.     Upon his appointment as Assistant Commissioner, Plaintiff Taylor was assigned to the Correction Intelligence Bureau ("CIB"). While at CIB, Keith Taylor created the Evidence Collection/Crime

16

Scene Unit, the Intelligence Analysis Unit, the Social Media Monitoring Unit, and the Phone Monitoring Unit. Plaintiff Taylor implemented these new units in order to address the shortcomings of CIB that had been detailed in an administrative report.

82.     Throughout his tenure as Assistant Commissioner, Plaintiff Taylor repeatedly requested additional support, personnel and equipment resources that his non-African American colleagues routinely had been provided. However, as of the date of his forced resignation, those requests had all been unmet by Defendants Murphy. Plaintiff Taylor had also been denied a budget for those resources while other non-African American Assistant Commissioners were granted such a budget.

83.      In or about April 2016, CIB was transferred back under uniform command following an incident where an inmate splashed a Correction Officer in the face with an unknown liquid. Plaintiff Taylor was removed from his supervisory position at CIB even though he was told that he had done nothing wrong.

84.     Chief Gumusdere advised Plaintiff Taylor that he would be supervising all uniformed staff activities. However, the uniformed staff stopped taking directives from Plaintiff Taylor and stopped reporting to him. Plaintiff Taylor was excluded from all Executive meetings. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

85.     Upon information and belief, Defendants Thamkittikasem, Brann, and/or Murphy directed uniformed staff to disregard Plaintiff Taylor's directives.

86.     Upon information and belief, Defendants Thamkittikasem, Brann, and/or Murphy advised representatives from outside government agencies to discontinue their working relationships with Plaintiff Taylor.

87.     Plaintiff Taylor's Administrative Assistant transferred to another command after hearing officers within CIB disparage Taylor.

88.     In essence, Plaintiff Taylor was stripped of all authority and responsibilities within CIB by

17

Defendants Ponte, Thamkittikasem, Brann, and Murphy. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

89.     In addition to the loss of his supervisory powers, Plaintiff Taylor had his parking space rescinded and his portrait removed from its proper place in the Fusion Center. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

90.     On February 24, 2017, Plaintiff Taylor reported to Defendant Thamkittikasem's office and was asked for his letter of resignation, despite having not received any written or verbal notice that the work he performed was inadequate or deficient in any way. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

91.     On June 21, 2017, Plaintiff Taylor filed a Charge of Discrimination with the NYSDHR and the EEOC, alleging that the DOC discriminated against him based upon its unlawful and intentional pattern and practice of race and color discrimination, retaliation, and the creation of a hostile work environment.

92.     On or about September 22, 2017, Keith Taylor received a Right to Sue Letter from the EEOC.

### Plaintiff Errol Toulon, Jr.

93.     Errol Toulon, Jr., an African-American male, was employed by the DOC as Deputy Commissioner of Operations from on or about July 2014 until his forced resignation on January 5, 2017. Errol Toulon, Jr. currently serves as Sheriff of Suffolk County, New York, a position he was elected to for a four year term.

94.     Prior to his tenure with the DOC, Errol Toulon, Jr. served with distinction as the Suffolk County Assistant Deputy County Executive for Public Safety from September 2012 to July 2014. As Assistant Deputy County Executive, he was required to report and advise directly to the County Executive on all matters of public safety and security. During his career in Suffolk County, Errol Toulon developed

initiatives and policies to combat drug addiction and gang violence, created and managed new security procedures and surveillance systems, and created initiatives to reduce recidivism and increase organizational accountability, *inter alia*. He was appointed to oversee all security procedures and protocols for all County facilities and was appointed Incident Commander for any natural disaster or terrorist attack within Suffolk County.

95.     Errol Toulon, Jr. also served the DOC with distinction for over twenty-two (22) years until his retirement at the rank of Captain in 2004. During his career with the DOC, Errol Toulon, Jr. handled all aspects of Department operations, including budgeting, recruiting, training, resource management and relationships with law enforcement groups and government offices. Errol Toulon, Jr. directed and controlled the spending of operating budgets in excess of two million five hundred thousand dollars ($2,500,000.00). Errol Toulon, Jr. received numerous awards and citations for his performance.

96.     Upon re-entering the DOC as Deputy Commissioner of Operations in 2014, Errol Toulon, Jr. immediately began to experience discrimination based upon his race and color.

97.     Errol Toulon, Jr. was denied both a residency and pension waiver while other non-African American subordinates were approved.

98.     Errol Toulon, Jr. was forced to choose one (1) location for his office, while his non-African American predecessor was afforded two (2) office locations in order to better carry out his supervisory duties.

99.     Despite his extensive experience and multiple distinctions, Errol Toulon, Jr.'s authority was constantly questioned and usurped by non-African American staff members, namely Defendants Thamkittikasem, Brann, and Murphy. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

100.    Errol Toulon, Jr.'s command, the Central Intelligence Bureau (CIB), was given exorbitant

responsibilities, but was denied adequate personnel and fiscal resources to fulfill the responsibilities. Such *was not* done to non-African American supervisors.

101.    Errol Toulon, Jr. had his office space and staff greatly diminished, while other non-African American executives' staffing needs were *increased*. When he requested additional staff resources, Errol Toulon, Jr. was told by Defendants Ponte and Murphy that the vetting process was extensive. However, during this period, non-African American Deputy Commissioners, such as Heidi Grossman and Greg Kuczinski, Timothy Farrell and James Walsh requested, and were promptly provided, additional staff resources.

102.    After being given additional responsibilities with the Quality Assurance and Integrity Unit, Errol Toulon, Jr. was yet again denied the requisite staffing resources. When he was relieved of these responsibilities, his replacement, a non-African American female, was in fact afforded the staffing resources that Errol Toulon, Jr. had previously been denied.

103.    The DOC then transferred Errol Toulon, Jr.'s Executive Officers to other commands per Defendants Ponte and Murphy. Non-African American Deputy Commissioners were *not* forced to relinquish executive members to lower ranking officers in this manner.

104.    Following an incident where the Bronx District Attorney declined to prosecute an inmate who had accosted a corrections officer, Errol Toulon Jr. was made the scapegoat and was retaliated against by the non-African American Executive Staff Defendants (Defendants Thamkittikasem and Murphy) who stripped him of his responsibilities overseeing the CIB. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

105.    Errol Toulon Jr. was banished to an office separate from the non-African American Deputy Commissioners and had his staff displaced. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

106.    On January 5, 2017, Errol Toulon Jr. was forced to resign by Defendant Thamkittikasem. Errol Toulon Jr. was unfairly made the scapegoat for the DOC's failure to hire the number of correction officers mandated by the Mayor of New York City, even though Toulon had not been provided the appropriate resources to make this a reality. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

107.    Errol Toulon Jr. was blacklisted by Defendant Ponte and Defendant Thamkittikasem from meetings related to hiring and had the hiring candidate list withheld from him for months, making meeting City Hall's hiring goals a virtual impossibility. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

108.    Errol Toulon Jr. was forced to resign, despite never receiving a performance evaluation or being informed that he was not performing at a satisfactory level. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

109.    On June 21, 2017, Errol Toulon Jr. filed a Charge of Discrimination with the NYSDHR and the EEOC and received the Right to Sue letter on or about October 16, 2017.

**Plaintiff Hakim S. El-Quhir**

110.    Hakim S. El-Quhir, an African American male, was employed by the DOC from December 8, 1998 to April 17, 2017, when he was forced to retire under duress, rather than face demotion and a significant reduction in pay.

111.    On February 1, 2016, Hakim S. El-Quhir was designated Warden of the DOC Transportation Division, where he served until his removal from the command on March 31, 2017.

112.    Defendant Ponte threatened Hakim S. El-Quhir with demotion to Assistant Deputy Warden, a Civil Service title that is three (3) rank positions lower than Warden, with a substantially reduced salary. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile

working conditions.

113.    Defendant Ponte's ultimatum came after Hakim S. El-Quhir was reprimanded along with several other white supervisors for non-satisfactory performance; however, Hakim S. El-Quhir, an African American, was the *only* supervisor forced to retire in lieu of demotion.

114.    Prior to the commencement of the instant action, Hakim S. El-Quhir filed an EEOC Charge of Discrimination against the DOC on May 1, 2015. Two weeks after the statute of limitations to file a lawsuit expired, Plaintiff El-Quhir was retaliated against by Defendant Commissioner Ponte for filing this EEOC.  Defendant Ponte told Plaintiff El-Quhir to either retire or be demoted back to his last Civil Service Rank of ADW by the end of the day.

115.    Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

116.    On at least one occasion, Plaintiff El-Quhir witnessed a white supervisor, Warden William Barnes, being reprimanded for non-satisfactory performance. Warden Barnes was removed from his command for said non-satisfactory performance; however, unlike Hakim S. El-Quhir, Barnes *was not* posed with the ultimatum to retire or face demotion. Rather, Barnes was simply re-assigned and sent to a newly created post, even though he had significantly less experience than Plaintiff Hakim S. El-Quhir.

117.    On September 8, 2017, Hakim S. El-Quhir filed a second EEOC Charge of Discrimination against the DOC, alleging that the DOC discriminated against him based upon his race and color, subjected him to a hostile work environment, and retaliated against him. He received a Right to Sue letter on or about February 26, 2018.

**Plaintiff Clement Glenn**

118.    Clement Glenn, an African-American male, has been subjected to promotional delays, increased work hours and responsibilities, significant decreases in both personnel and fiscal resources, and

an extreme loss of overtime compensation -- all adverse conditions that his similarly situated, non-African-American colleagues were *not* forced to endure.

119.   In or about June 2004, Clement Glenn was designated as Assistant Deputy Warden. In or about 2007, he was assigned as a Court Executive Officer, a position he held until his promotion to Deputy Warden in or around August 2011.

120.   Clement Glenn's non-African American colleague, namely Asst. Deputy Warden DiBernadino,  consistently received cash overtime opportunities and compensation that Clement Glenn was denied.

121.   During his tenure as a Court Executive Officer, Clement Glenn was denied cash overtime compensation by Defendants, even though he consistently worked well over eight (8) hours a day. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

122.   Clement Glenn's overtime was allocated as compensatory time, of which he accrued approximately two (2) years and six (6) months' time. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

123.   As such, when he retires, Clement Glenn *will not* be properly compensated for his time and his pay-out will be capped at one (1) year compensatory time. The remaining time will be *fortified*. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

124.   Clement Glenn's promotion to Deputy Warden was unfairly delayed seven (7) years, a delay his non-African American Assistant Warden colleagues did *not* experience, including Defendant Murphy, Brian Sullivan, and retired Dep. Warden Tatusco.

125.   During those seven (7) years, Clement Glenn consistently saw numerous non-African

American Assistant Wardens promoted to Deputy Warden within two (2) years of their designation as Assistant Warden, including Defendant Murphy, Brian Sullivan, and retired Dep. Warden Tatusco.

126.   When he finally was promoted to Deputy Warden, Clement Glenn spent the entirety of his tenure assigned to the jails, while numerous non-African American Deputy Wardens and their non-African American subordinates were either quickly promoted to, or transferred into, high levels of management with little to no inmate interaction. One example of this discrimination is Defendant Murphy. Despite these restrictions, Clement Glenn still received numerous accolades from the Executive Staff for his performance as a Deputy Warden.

127.   Upon his promotion to Warden, Clement Glenn was immediately subjected to personnel and fiscal restrictions by Defendant Murphy that his non-African American predecessors and contemporaries were not subjected to.

128.   Clement Glenn's staff was reduced significantly while his responsibilities continued to increase.

129.   Clement Glenn experienced an intensified level of scrutiny and tactics by Defendant Murphy, aimed at marginalizing him. Said scrutiny and tactics were not experienced by his non-African American predecessors and contemporaries.

130.   Such unfair and discriminatory restrictions and increased responsibilities culminated in the imposition of a housing violation against Clement Glenn in or about March 2016.

131.   Following the undeserved housing violation, Clement Glenn was immediately transferred to the Criminal Justice Bureau and then to the Hospital Prison Ward. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

132.   In or about August 2016, Clement Glenn was transferred to the West Facility, where he again was afforded only minimal staff, resources, and support, unlike his non-African American counterparts,

namely William Barnes and Brian Sullivan. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

133. Clement Glenn took Family Medical and Leave Act ("FMLA") leave in or about December 2016.

134. Upon Clement Glenn's return from FMLA leave, resources were *immediately removed* from his command. Despite the continued increase in the inmate population at Clement Glenn's command, his staff resources were, and continue to be, consistently reduced disproportionately to non-African American counterparts.

135. During his tenure with the DOC, Clement Glenn has experienced an environment where his non-African American subordinates wield significant power and control *over him,* including Brian Sullivan and Roy Miller. Non-African American subordinates like Brian Sullivan were promoted more quickly and into more prominent positions than Clement Glenn and his African American contemporaries.

136. The non-African American subordinates were provided more overtime opportunities and receive significantly more compensation than Clement Glenn and his African American contemporaries.

137. Clement Glenn is required to work longer hours and take on substantially more responsibilities with less resources and compensation than his non-African American subordinates and contemporaries such as Asst. Dep. Warden DiBernadino, Brian Sullivan, Defendant Murphy.

138. On September 8, 2017, Clement Glenn filed a Charge of Discrimination against the DOC with the NYSDHR and the EEOC, alleging that the DOC subjected him to discrimination based upon unlawful and intentional patterns and practices of race and color discrimination, retaliation, and creation of a hostile work environment. The Right to Sue letter is pending.

**Plaintiff Anthony Toulon**

139.   Anthony Toulon is a thirty-two (32) year member of DOCS, holding the rank of Deputy Warden for over five (5) years before he reported sick for the 9/11-related illness Neurosardcoidosis.

140.   Prior to his illness, in October of 2015, he had obtained seven (7) years of "Perfect Attendance."

141.   Plaintiff Anthony Toulon's Performance Evaluations as a Deputy Warden, ranged from "GOOD" to "OUTSTANDING," with recommendations by his supervisors that he be considered for "Promotion."

142.   During his tenure as Deputy Warden, he has managed all three (3) disciplines: first, as the Deputy Warden of Security at the Robert N. Davoren Center, second as the Administration Deputy Warden at the Vernon C. Bain Center, and third as the Security & Programs Deputy Warden of the Vernon C. Bain Center. Thereafter, he managed all three disciplines, as well as being required to be the "Acting Warden" of the Vernon C. Bain Center.

143.   Plaintiff Anthony Toulon was then transferred to the Manhattan Detention Complex, where he managed the Administration Discipline for the facility, and jointly acted as Warden along with, then Deputy Warden Lisa Cooper.

144.   He was subsequently transferred to the Eric M. Taylor Center, where he again, at different time periods, managed all three disciplines.

145.   After applying for and being interviewed for promotion to the rank of Warden Level III, in February 25, 2013, Plaintiff Anthony Toulon made an inquiry to then Deputy Commissioner of Human Resources, Alan Vengersky, as to whether Toulon made the list of qualified candidates for Promotion to Warden Level III. Vengersky stated "yes."

146.   Plaintiff Anthony Toulon then proceeded to await further notifications for future interviews.

26

Plaintiff Anthony Toulon fulfilled all of his qualifications for promotion.

147.    However, at some point, a different list of qualified candidates appeared and Plaintiff Anthony Toulon was inexplicably removed from the list.

148.    After supplying documentation that he completed the process to be on the qualified list, the agency promoted several non-African American individuals ahead of Plaintiff Anthony Toulon.

149.    White individuals, namely Brian Sullivan, Martin Murphy, and Turhan Gumusdere, who had recently gone through the first stages of the interview process, had less tenure and seniority in the rank of Deputy Warden than Plaintiff Anthony Toulon, had less experience, and did not perform in all the disciplines as Plaintiff Toulon had, received promotions.

150.    White individuals, namely Brian Sullivan and Martin Murphy, as per the Directive, did not even serve in a jail for one year.

151.    Meanwhile, Plaintiff Anthony Toulon served in this capacity for over three (3) years, as well as serving as Acting Warden.

152.    On or about January 2015, then Deputy Warden Charlton Lemon, Deputy Warden Hayes, Deputy Warden Blackmon, and Plaintiff Anthony Toulon, all African Americans, met with Commissioner Ponte, who wanted to "tap into" their knowledge of the Disciplines for Deputy Warden.

153.    Defendant Commissioner Ponte, specifically and emphatically stated to these four, that they were the *best* at their disciplines (Lemon at Security, Hayes and Toulon at Administration, and Blackmon at Programs). The Commissioner requested that the four draft the ideology they apply to their disciplines, the methods they utilize, and a description of their jobs.

154.   The Commissioner further stated that all four African Americans would be promoted.

155.   After completing the task, no further words of "promotion" were mentioned to Plaintiff Toulon.

156.   As of the date of this Amended Complaint, Charlton Lemon, was *the only one* out the four African Americans, who was given a promotion to Warden.

157.   As previously stated, the Department has promoted numerous non-African American individuals with less credentials, experience, knowledge, tenure and seniority in rank. One example of this William Barnes, a white male.

158.   On September 16, 2017, Anthony Toulon filed an EEOC Charge of Discrimination against the DOC, alleging that the DOC discriminated against him based upon his race and color, subjected him to a hostile work environment, and retaliated against him. He received a Right to Sue letter on or about April 13, 2018.

## FACTUAL ALLEGATIONS – NON-AFRICAN AMERICAN COMPARATORS

159.   The existence of non-African American comparators employed by DOCS who, unlike Plaintiffs, *did not* suffer from disparate treatment and/or impact in their employment at the DOC, is well-documented. In fact, many of these non-African American comparators received promotions and/or continued employment despite being less-qualified than Plaintiffs and having disciplinary issues.

Defendant Cynthia Brann

160.   Plaintiffs Charles Daniels, Errol Toulon, and Keith Taylor are African American males who were members of the DOC Executive Staff. These Plaintiffs were forced to resign for baseless allegations of "poor performance," "failure to move the bar" or "overall ineffectiveness."

161.   Charles Daniels was employed from January 17, 2017 through April 6, 2017. The employment range encompassed eighty (80) calendar days, which consisted of fifty-eight (58) work days.

162.     Defendant Cynthia Brann, Deputy Commissioner, Quality Assurance (white female) during that same time frame was head of the Office of Policy and Compliance. The State Commission of Correction SCOC, charged with regulatory over site of corrections within the State of New York, reviewed, audited and assessed NYC DOC compliance with State laws, regulations and directives. In all audits, reviews, assessments to include follow-ups during Defendant Brann's tenure, the DOC failed 100% of the time. The highest score achieved in any and all of the aforementioned audits, reviews, assessments or follow-ups was a numerical score of 38.

163.     Despite the foregoing, Defendant Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor, was *not* forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Brann was subsequently *promoted* to Acting First Deputy Commissioner, then Acting Commissioner, then to the highest position in NY DOC - Commissioner.

164.     Additionally, Defendant Commissioner Brann was fined $6,000 for improper use of her official City vehicle, which she drove to chic suburban shopping malls and Kennedy Airport.  Specifically, Defendant Commissioner Brann admitted to the serious ethics violations of taking sixteen (16) personal trips (13 to shopping malls and 3 to airports) in a Department car, which was supposed to be used while performing Official duties or commuting between home and work.

165.     As part of the disciplinary action, Defendant Commissioner Brann was required to reimburse the agency $493.67 for the mileage on the vehicle and forfeit eight (8) days of personal leave, worth $5,824.00.

166.     After being fined, forced to reimburse the agency and forfeit personal leave, Defendant Commissioner Brann was then cited for *yet another ethics violation*. Defendant Commissioner Brann also admitted to <u>misusing her DOC position</u> when she attempted to pay the Board-imposed fine she had received. Board fines must be paid with bank check, money order, cashier's check or certified check. After

complaining to her subordinate that this form of payment would be difficult for her because she did not have a New York bank account, her subordinate offered to obtain a cashier's check for her to pay the fine to the Board. Defendant Brann provided the subordinate with her personal check and he provided her with a cashier's check purchased though funds drawn from his personal bank account. *COIB v. Brann*, COIB Case No. 2017-156b (2017).

167.   Despite the foregoing, Defendant Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was *not* forced to resign or be fired.

168.   In summary, Defendant Commissioner Brann has failed at every level of leadership within the DOC, repeatedly violated ethics laws at the expense of subordinates and taxpayers, and when caught, claimed ignorance of the rules. Additionally, Defendant Commissioner Brann's performance as Commissioner has been horrific.  By any measurement standards, Defendant Commissioner Brann has failed. Serious inmate-on-staff and inmate-on-inmate violence has increased under Defendant Commissioner Brann's tenure although staffing has increased and the inmate population has declined.

169.   Despite the foregoing, Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired, in fact, she was rewarded with a promotion to the top position within DOCS.

170.   In comparison to Defendant Brann, Plaintiff Daniels, former Senior Deputy Commissioner, is a highly credentialed and experienced leader who served as Complex Warden and Senior Deputy Assistant Director during his tenure in the Justice Department Federal Bureau of Prisons. Plaintiff Daniels was forced to resign under duress even though he was the most experienced executive at the agency, specific to managing predatory, violent and gang directed inmates. Defendant Commissioner Brann had *no experience* dealing with volatile inmates, and never acquired institutional experience at any level. This led directly to Defendant Commissioner Brann's inability to lead as Deputy Commissioner or Commissioner.  Defendant

Commissioner Brann is a failed administrator as evidenced by the State Commission of Correction and the Federal Monitor specific to the Nunez Consent Order. A review of any reports published regarding any and all areas for which Defendant Commissioner Brann maintained charged post, during and after Plaintiff Daniels' tenure will demonstrate her well-documented failed leadership.

171.   Despite the foregoing, Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Brann was given the highest position within the DOC – Commissioner, by the City.

Defendant Jeff Thamkittikasem

172.   Similar to Defendant Brann, Defendant Thamkittikasem's tenure with DOCS has been marred with corruption and violations of ethics standards and polices, including an increase in inmate violence.

173.   Defendant Thamkittikasem was disciplined by the NYC Conflicts of Interest Board, similar to Defendant Brann. The Board fined Defendant Thamkittikasem $4,000.00 for using his take home DOC vehicle for fourteen (14) personal trips, including numerous trips to New York City and New Jersey airports, as well as one trip to Washington, D.C. and one trip to Virginia for personal matters. Defendant Thamkittikasem was also forced to reimburse DOC $1,484.97 for the mileage incurred and forfeited six (6) days of personal leave to DOC valued at $4,800.00.

174.   It has been corroborated by Shirvana Gobin, Deputy Commissioner for Strategic Planning and Management, who worked directly for Defendant Commissioner Ponte, that Defendant Thamkittikasem was knowingly providing inaccurate and skewed information regarding the violence within Rikers Island jails to the Mayor's Office, and inaccurately skewed information regarding the DOC to the Mayor's Office to meet his own agenda.

175.    Despite the foregoing, Defendant Thamkittikasem, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Thamkittikasem has remained in his Executive Staff position of Chief of Staff, reporting directly to the Mayor's Office.

<u>Defendant Martin Murphy</u>

176.    Similar to Defendants Brann and Thamkittikasem, Defendant Murphy also faced corruption and ethics standards violations.

177.    During Defendant Murphy's tenure as Chief of Department from February 2015 until the time of his resignation in 2017, it is well-documented that violence within Rikers Island increased exponentially, yet Defendant Ponte and Defendant Thamkittikasem continued to keep Murphy on as the Chief of Department, the highest ranking uniform of the DOC.

178.    Unlike Defendant Murphy, Plaintiff Daniels, an African American, was forced to resign for "failure to reduce violence" after serving only approximately eighty (80) days in DOC.

179.    Unlike Defendant Murphy, Plaintiff Daniels had to work on weekends, and responded to emergency situations on Rikers Island throughout his tenure.

180.    Unlike Defendant Murphy, Plaintiff Daniels had his authority usurped since he was never officially introduced in his management title to DOCS personnel.

181.    During his tenure, Plaintiff Daniels personally took the time to train Wardens and Deputy Wardens on incident management, restrictive housing staff, and Assistant Chiefs on quality sanitation and security inspections consistent with American Correctional Association Standards, while Defendant Murphy failed to train said individuals.

182.    Unlike Defendant Murphy, Plaintiff Daniels was told to brief the First Deputy Mayor on violence incidents on Rikers, despite not having any operational authority over the response protocols and incident follow-up.

Turhan Gumusdere

183.    When Plaintiff Keith Taylor was first hired by the DOC, his very first Post-Incident Review meeting concerning a February 26, 2015 stabbing at AMKC occurred on March 5, 2015 at 12:00 pm. At the invitation of Chief Mark Scott, an African-American male executive, Plaintiff Taylor observed the meeting and its attendees. Warden Turhan Gumusdere (white male uniformed executive with an equivalent rank) who was responsible for AMKC security, arrived very late and was completely unprepared for the meeting. Chief Scott was visibly angry and dismissed Gumusdere from the meeting out of what appeared to be disgust for Gumusdere's unprofessionalism, and he gave Gumusdere a verbal reprimand for his lateness and unprofessionalism. Plaintiff Taylor witnessed at this post-incident review meeting how Gumusdere only received a verbal reprimanded with no other repercussions for severely unprofessional behavior.

184.    On March 10, 2015, Gumusdere was reassigned out of AMKC due to a sexual attack of a female officer by a hulking inmate. It further stated that "Turhan Gumusdere was transferred out of the Anna M. Kross Center to supervise the several units including the new Enhanced Supervision Unit, where some of the jail's worst behaving inmates will be housed." Warden Gumusdere was not fired or demoted for the operational deficiencies which allowed the sexual attack on the officer to occur while he was the Warden-in-Charge of AMKC at the time. These facts were also reported in a New York Daily News article dated March 10, 2015 entitled, "EXCLUSIVE: Inmate who helped save Rikers Island prison guard from rape gets beaten by group of fellow convicts for not giving them proper credit."

185.    Prior to this incident, the New York Times, in a September 21, 2014 article titled "Report Found Distorted Data on Jail Fights at Rikers Island," reported the following about then-Assistant Deputy

33

Warden Gumusdere's performance as a manager at AMKC: "A dozen investigators eventually produced a confidential report, obtained by The New York Times, which concluded that hundreds of inmate fights had been omitted from departmental statistics; … the deputy warden, Turhan Gumusdere, had 'abdicated all responsibility' in reporting the statistics and …should be demoted."

186.    On October 28, 2014, the New York Daily News, in an article titled "Top prison guard prepares to retire as de Blasio appoints 3 to oversight board" stated: "…and another top jail boss, Turhan Gumusdere, [was] underline promoted despite [his] prominent role[] running the Rikers facility where federal investigators found 'appalling treatment of adolescents.'"

187.    On October 30, 2014, in an article titled "'Infamous' graffiti vandal to head Rikers jail," the New York Post reported: "Turhan Gumusdere, 53, was promoted by DOC Commissioner Joseph Ponte to the top spot at the Anna M. Kross Center — even though Ponte knew about his past" as a "notorious graffiti artist."

188.    Despite the foregoing, Warden Gumusdere continued to be rapidly promoted to Bureau Chief of Security, second only to Chief of Department, the highest ranking uniformed position, even though the violence numbers continued to skyrocket amidst published reports that now-Bureau Chief of Security Gumusdere was actively suppressing the reporting of violent incidents in DOC facilities: "As pressure mounts to reduce violence at the troubled jails, top correction bosses — seeking to create the impression they have turned matters around — repeatedly order underlings to downgrade incidents, a Daily News review of scores of internal documents shows. Knife fights and ugly brawls between inmates, even attacks on officers, often end up airbrushed in the records as routine 'log book entries,' sources familiar with the process say. The main culprit, critics say, is Security Chief Turhan Gumusdere, a man who has faced scandal in the past for distorting data in the jails by deleting hundreds of fights among inmates from the records when he was a deputy warden." New York Daily News, August 28, 2016, "EXCLUSIVE: Rikers

Island correction bosses routinely 'purge' unfavorable violence stats to create illusion of reform, review shows."

189.    After his meteoric rise up the DOC ranks, Gumusdere was eventually allowed to retire, even though the New York City Department of Investigation had an active investigation into his alleged manipulation of violent assault incident numbers in DOC facilities: "A top city jail official accused of ordering underlings to minimize serious attacks on or by inmates has quietly retired as the investigation against him drags on. Security Chief Turhan Gumusdere directed officers to manipulate reports of violent assaults by listing them as routine "log book entries," according to multiple jail sources and records obtained by the Daily News." New York Daily News, August 29, 2017, "Jail official accused of manipulating data on violent Rikers assaults retires amid investigation."

190.    Gumusdere, a male white executive, enjoyed the white privilege and entitlement that allowed him to continually be *promoted six (6) times* from Assistant Deputy Warden all the way up to Bureau Chief of Security, despite the irrefutable fact that violent incidents skyrocketed within DOC facilities during that time, and despite allegations that he was simultaneously engaging in corrupt actions to suppress the actual number of violent incidents occurring within DOC facilities.

191.    During this very same time period, the African American Plaintiffs were *not* promoted for their positive work efforts or performance, and were instead forced to resign.

Gregory Kuczinski

192.    Plaintiff Keith Taylor was hired by DOC in February 2015 to run the Correction Intelligence Bureau, and Gregory Kuczinski (white male executive) was hired as an Assistant Commissioner one month later to work in the Investigation Division.

193.    In many ways, Plaintiff Taylor and Kuczinski have similar backgrounds: Kuczinski retired after 15 years as a Sergeant from the Warrants Division of the NYPD; Plaintiff Taylor retired after 24 years

as a Sergeant Special Assignment from the NYPD's Emergency Service Unit; Kuczinski completed his law degree while working for the NYPD; Plaintiff Taylor completed two masters and a doctorate while he worked in the NYPD.

194.    However, Kuczinski was hired even though he "had little investigative and no internal affairs experience from his police tenure" as compared to Plaintiff Taylor's seventeen (17) years' experience as a decorated Detective supervisor, NYPD management and policy analyst supervisor, Internal Affairs supervisor, and supervisor in the Emergency Service Unit (Special Weapons and Tactics/heavy rescue/hazardous materials/open water rescue/high angle rope rescue/emergency medical technician/trench and building collapse response/ etc.).

195.    Additionally, Plaintiff Taylor had certifications as a FEMA Urban Search and Rescue Planning Team Manager, FEMA Master Exercise Practitioner, and IAEM Certified Emergency Manager.

196.    Within a few months of his hire, Kuczinski distinguished himself with the abuse of Departmental resources, with his subsequent Conflicts of Interest Board ruling noting that "members of the Department found guilty of violating the rules and regulations and engage in conduct unbecoming an employee may be dismissed from the Department or suffer such other punishment as the Commissioner may direct."

197.    According to the NY Times, Commissioner Ponte's punishment was to promote Mr. Kuczinski "to the division's top position… just days after he was rebuked and fined $1,500 for assigning an on-duty subordinate to drive him and his family to the airport for a summer vacation."

198.    In comparison, during Plaintiff Taylor's entire two-year DOC tenure, he violated no departmental, ethical, or criminal rules, regulations or laws. Plaintiff Taylor did this both due to his own moral character and his determination to provide an example of appropriate leadership for the individuals working for and with him.

199.   During this time period, Kuczinski had Departmental financial and personnel resources available to him that Plaintiff Taylor did not have, even though the two were of equivalent ranks with similar roles.

200.   Plaintiff Taylor had to repeatedly ask Kuczinski to sponsor various purchases for the CIB in order to get the specialized investigative items needed.

201.   Additionally, in September 2015, Kuczinski brought the NYC DOI Inspector General to tour the evidence collection and preservation facility that Plaintiff Taylor had recently created in order to, which Kuczinski explained to Plaintiff Taylor later, avoid the release of a damning DOI report which would have exposed the poorly run evidence preservation practices of DOC, which would include the Investigation Division that Kuczinski was responsible for.

202.   According to the NY Times, during Mr. Kuczinski's leadership, the Investigation Division "still suffered from many of the same deficiencies outlined in Mr. Bharara's report three years ago. In a report last month, a federal monitoring team responsible for overseeing the reform effort at Rikers harshly criticized the division, accusing it of failing 'to pursue disciplinary action in cases where there was objective evidence of wrongdoing.'"

203.   In comparison, during the same time period, Plaintiff Taylor's unit had a record number of inmate re-arrests and unprecedented bail amounts of up to and including one million dollars given to inmates for assaults on staff.

204.   Additionally, Plaintiff Taylor created, implemented and accredited the evidence collection facility and hired a forensically trained crime scene team to run the facility. The unit collected and preserved a record amount of over 2,300 pieces of evidence (contraband, weapons, narcotics, uniforms, sexual assault kits, etc.) from Department facilities within its first three months of existence.

205.    Plaintiff Taylor revised CIB protocols that had last been updated fourteen years prior, or created new ones to reflect modern "best practices" investigative protocols.

206.    Plaintiff Taylor created and implemented a joint NYPD-NYCD arrest processing training course, which all CIB arrest officers completed.

207.    Plaintiff Taylor re-established a DOC presence and successful working relationship with a Federal law enforcement multi-agency drug-prohibition program, and created an intelligence analysis team by hiring data scientists, purchasing advanced analytical analysis programs such as STATA, SAS with Enterprise Miner and SPSS, and producing analytical products for executive staff; creating investigator/supervisor/civilian periodic evaluations and procedures, and multiple civilian position tasks and standards both for NYC DOC and submitted for approval by the NYS Civil Service Commission.

208.    Plaintiff Taylor successfully created and implemented a Request for Proposal for forensics laboratory testing services, which resulted in an agency three-year contract worth $2.1 million dollars.

209.    Plaintiff Taylor created a Social Media Team by purchasing specialized software and providing specialized training to CIB investigative personnel to monitor public social media networking venues to uncover criminal activities of inmates who use virtual communities or other social mediums to conspire to or actually commit crimes within DOC facilities.

210.    Plaintiff Taylor created a weekly CIB activity report to provide baseline unit metrics and allow DOC executives to better gauge CIB's arrest and intelligence activity, started a daily phone conference between CIB personnel and facility security staff to share intelligence from a common operating picture, thus allowing for better awareness of and coordination of efforts to fight gang activity, and produced an annual CIB State of Command Report which established unit metrics regarding its arrest, intelligence and investigative activities.

211.    All of the aforementioned efforts, and various others, undertaken by Plaintiff Taylor were conducted even though he had no control over budgetary decisions, including personnel decisions. In contrast, Kuczinski, a male white executive, enjoyed the white privilege and entitlement that allowed him to be promoted from Assistant Commissioner to Deputy Commissioner even though the Investigation Division continued to suffer from the "same deficiencies… [and failed to] pursue disciplinary action in cases where there was objective evidence of wrongdoing."

212.    In September 2016, Plaintiff Taylor was tasked to work with retired NYPD Bureau Chief Douglas Zeigler, an African-American male executive hired by Commissioner Ponte to become a Deputy Commissioner of Intelligence. Zeigler tasked Plaintiff Taylor to work with him to create an expanded mission and role for CIB, which would be given a new title of Analytical Intelligence Department. Zeigler asked Plaintiff Taylor to continue to work as his Executive Officer. By the end of September 2016, the PowerPoint presentation and organization charts were completed for submission to OMB for funding approval.

213.    While awaiting OMB funding, Commissioner Ponte requested that a supervisor and two investigators each from ID and CIB be utilized to start conducting investigations, primarily through the use of phone monitoring. A sixty-day strategic plan was formulated and implemented.

214.    One of the first phone monitoring investigations uncovered a DOI anti-corruption investigation, which was brought to the attention of Defendant Commissioner Ponte to make him aware that the phone monitoring investigation was shut down once it was clear that a DOI investigation was uncovered.

215.    The New York Times reported that "Mr. Ponte had learned of the surveillance in February, after another official [Zeigler/Taylor] had shut it down… but Mr. Ponte did not report the surveillance to the investigation agency [DOI]." Kuczinski was then inexplicably given control of CIB, even though Plaintiff

Taylor had never received any verbal or written notice by Defendant Commissioner Ponte or anyone else in any leadership position of any deficiencies in his performance or the performance of CIB.

216.    In comparison, Mr. Kuczinski was retained as the Deputy Commissioner of Investigations and Intelligence (CIB) by Defendant Commissioner Ponte, even after a subsequent DOI investigation uncovered "DC Kuczinski's vehicle usage for 2016 revealed widespread misuse of his take-home vehicle privileges" for which Kuczinski was fined $1,500.00 for misusing his position and Department resources by having an on-duty Correction Officer transport him and his family in an agency vehicle from DOC Headquarters to JFK Airport for a family vacation, as well as assist with unloading the luggage.

217.    This repeat offense was still not enough for Defendant Commissioner Ponte to remove Kuczinski as Deputy Commissioner of Investigations (and Intelligence).

218.    In comparison, on February 24, 2016 Plaintiff Taylor was told to submit his letter of resignation by Defendant Thamkittikasem, solely because "the Department is going in a different direction; we are giving CIB to Kuczinski."

219.    A few months later, the New York Times reported that "in a long letter to Mayor Bill de Blasio, the Department of Investigation said Mr. Kuczinski and his subordinates violated city rules and regulations by repeatedly listening in on telephone calls between an investigator with the agency and inmates who were serving as informants, several people with knowledge of the letter said… but Mr. Ponte did not… take any action against Mr. Kuczinski, whom he had promoted into his current job."

220.    DOI's public statement about the matter stated the following: "A DOI investigation has revealed that members of Department of Correction ("DOC") staff, including Deputy Commissioner for the Investigation Division and Correction Intelligence Bureau Gregory Kuczinski, engaged in unauthorized surveillance of DOI undercover operations. Specifically, over a period of months this year, DOC staff, including at the direction of DC Kuczinski, used DOC technology to listen to calls placed between DOI and

certain confidential informants.  DOI's investigation demonstrated that this was not inadvertent, but that DOC staff deliberately targeted DOI investigators for surveillance, and that they continued the surveillance even after written directives that such surveillance was to end."

221.    The New York Times reported at the time that "Mr. Ponte, in the face of the accusations against Mr. Kuczinski, defended his deputy commissioner's actions several times. He did so when the investigations agency made the spying allegations and again after Mr. Kuczinski was removed from his internal affairs post and placed on modified duty."

222.    In comparison, Plaintiffs Daniels, Toulon, Taylor, and El-Quir's forced resignations were not prompted by any actions taken by Plaintiffs. The stark comparison between Kuczinki's tenure and dismissal from DOC and Plaintiffs is a prime example of adverse employment treatment and impact and actions based upon race and color, and part of a larger pattern and practice of discrimination, retaliation and hostile work environment against African American male executives.

### FACTUAL ALLEGATIONS - CONCLUSION

223.    Plaintiffs attempted to ignore the discriminatory practices within the DOC. They believed that if they simply continued to excel and receive outstanding evaluations, their accomplishments would eventually be recognized. But after years of being passed over for promotions while less qualified non-African American employees were advanced before them, and having their authority and decision-making power marginalized, circumvented, and usurped, Plaintiffs have come to the painful realization that their race and color matters more to the DOC than their achievements or records of service. The African American Plaintiffs also came to the stark realization that if and when they did not partake in the corruption, cover-up and falsification of statistical data within DOC, their days within the agency became numbered.

224.    Every time Plaintiffs were passed up for desirable assignments, denied transfers into desirable units, given low-visibility positions, had their authority removed from them, and denied the rank

and prestige that comes with promotions, they paid a price. The Plaintiffs endured humiliation, embarrassment and degradation to otherwise stellar careers in law enforcement.

225.    Plaintiffs suffered a powerful emotional toll. Plaintiffs devoted significant time and energy into the DOC and took tremendous pride in their work. However, they have been forced to acknowledge the humiliating and degrading reality that ultimately, their records of achievement, integrity, and lengthy years of service mattered less to the DOC than the color of their skin.

226.    The monetary loss that Plaintiffs and other African American employees in the DOC suffered is great. They lost tens of thousands of dollars each year when they were not promoted, and hundreds of thousands of dollars after being forced to either resign or retire, resulting in significantly smaller pensions.

227.    There is a stark and unjustifiable under-representation of African Americans in the managerial ranks of the DOC. The pervasively discriminatory environment in which Plaintiffs and other African Americans were forced to work has caused them substantial harm and will continue to harm all other African American members of the DOC who are never given the opportunity to advance within it.

### FIRST CAUSE OF ACTION
(Unlawful Discrimination – Title VII, 42 U.S.C. § 2000e *et seq.*)

228.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

229.    Defendant City is an employer as defined in Title VII, and at all relevant times herein, employed Plaintiffs.

230.    Defendant City discriminated against Plaintiffs in violation of 42 U.S.C. § 2000-e2(a), based upon race and color by denying or delaying promotions, and/or forcing them to resign, therefore giving them less pay and rank as compared to less qualified, non-African American employees.

231.    This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a

disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

232.   As a result of Defendant City's discrimination, Plaintiffs suffered and continue to suffer damages, including but not limited to lost income, and mental anguish, pain and suffering. They are also entitled to attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

**SECOND CAUSE OF ACTION**
(Unlawful Discrimination – New York Executive Law § 296)

233.   Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

234.   The acts described above constitute unlawful discriminatory employment practices that violate Section 296 of the New York Executive Law.

235.   Defendant City discriminated against Plaintiffs by failing to promote them, marginalizing them, and forcing them to resign or retire due to their race and color.

236.   This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

237.   As a result of Defendants' discrimination, Named Plaintiffs have been damaged and are entitled to compensatory damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

43

### THIRD CAUSE OF ACTION
(Unlawful Discrimination-N.Y.C. Admin. Code §§ 8-101 *et seq.*)

238.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

239.    The New York City Administrative Code is explicit that the City Human Rights Law "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and that exceptions and exemptions "be construed narrowly in order to maximize the deterrence of discriminatory conduct." N.Y.C. Admin. Code § 8-130(a)-(b).

240.    The acts described above constitute unlawful discriminatory employment practices that violate Section 8-107 of the New York City Administrative Code.

241.    All Defendants unlawfully discriminated against Plaintiffs by denying them promotions due to their race, removing their power and authority as supervisors due to their race and color, providing them less resources due to their race and color, and ultimately forcing them to either resign or retire due to their race and color, therefore giving them less pay, authority, and/or rank as compared to less qualified non-African American supervisors.

242.    This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

243.    As a result of Defendants' discrimination, Plaintiffs have been damaged and are entitled to compensatory damages, punitive damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## FOURTH CAUSE OF ACTION
### (42 U.S.C. §1983 Against All Individual Defendants)

244.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

245.    All of the acts and conduct of the Individual Defendants and Defendant CITY, by and though its agents, herein stated were done under color of state law, while in the performance of their duties as Supervisors for the DOC.

246.    The facts and circumstances cited above are in violation of Plaintiffs' Fourteenth Amendment right under the Equal Protection Clause of the United States Constitution to be free from retaliation, discrimination and harassment in his employment with the CITY and DOC.

247.    That Individual Defendants actions, as alleged herein, were committed under color of State law.

248.    That Individual Defendants did conspire to violate Plaintiffs' Constitutional rights by actually depriving them of entitlement to promotions, overtime, staffing and to be free of harassment and retaliation within the work place, and other pension rights.

249.    That Individual Defendants did willfully and knowingly make false claims against the Plaintiffs with the intent of causing Plaintiffs to be marginalized, constructively discharged and/or demoted.

250.    That Defendants maliciously and vindictively evaluated Plaintiff's performance in a negative matter solely because of their race and color so that they would be denied an executive staff position within DOC.

251.    That despite Defendants' knowledge that Plaintiffs were well qualified to perform their responsibilities within DOC they nevertheless forced them to endure the aforementioned employment conditions under duress knowing that they were capable of performing the duties of an executive officer

45

within DOC, Plaintiffs were the victims of wrongful constructive discharge and/or demotion from the DOC and denied the benefits of working for the DOC.

252.    Plaintiffs were denied their Constitutional rights pursuant to the Fourteenth Amendment in violation of their equal protection and due process.

253.    That as a direct and proximate result of the aforementioned conduct of the Individual Defendants, Plaintiffs were deprived of their property rights, all in violation of their rights under the Fourteenth Amendment rights to equal protection and due process under 42 U.S.C. §1983 to the United States Constitution.

254.    That as a direct and proximate result of the foregoing, Plaintiffs sustained injury and damage consisting of loss of property, economic damages, legal expenses and emotional distress for which Defendants are liable.

255.    By reason of the foregoing, Individual Defendants have violated §1983, and Plaintiffs are entitled to economic, emotional and compensatory damages in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00); and punitive damages against the individual Defendants in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## JURY DEMAND

256.    Plaintiffs hereby demand a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and award the following relief:

(1)    A judgment declaring that Defendants have committed the violations of law alleged in this action;

(2)    An order granting appropriate injunctive relief and declaratory relief for a period of

time to be determined by the Court;

(3)    Actual or compensatory damages against all Defendants in an amount not less than TEN MILLION DOLLARS ($10,000,000.00) for each cause of action;

(4)    Punitive damages against Individual Defendants in an amount TEN MILLION DOLLARS ($10,000,000.00);

(5)    Reasonable attorneys' fees and costs; and

(6)    Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*Christopher F. Bellistri*

_____

Christopher F. Bellistri
AVALLONE & BELLISTRI, LLP
*Attorneys for Plaintiffs*
3000 Marcus Avenue
Suite 3E07
Lake Success, New York 11042
(516) 986-2501

TO:    **VIA ECF**
       Matthew J. Connahan, ACC
       Corporation Counsel of the City of New York
       100 Church Street, Room 2-112
       New York, New York 10007